**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 2, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff–Appellee,

RICHARD D. CLAYTON,

    Receiver,

v.

DAVID M. WOLFSON; NUWAY
HOLDING, INC., a Nevada
corporation; MOMENTOUS GROUP,
LLC, a Utah limited liability company;
LEEWARD CONSULTING GROUP,
LLC, a Utah limited liability company;
SUKUMO LIMITED, also known as
Sukumo Group, also known as
Fujiwara Group, also known as First
Chartered Capital Corporation, also
known as First Colonial Trust, also
known as First China Capital, also
known as International Investment
Holding, a company incorporated in
the British Virgin Islands; MICHAEL
SYDNEY NEWMAN, also known as
Marcus Wiseman; STEM GENETICS,
INC., a Utah corporation; HOWARD
H. ROBERTSON; GINO CARLUCCI;
G & G CAPITAL, LLC; F10 OIL
AND GAS PROPERTIES, INC.; JON
H. MARPLE; MARY E. BLAKE;
DIVERSIFIED FINANCIAL

No. 06-4035

RESOURCES CORPORATION, a
Delaware corporation; JOHN
CHAPMAN; VALESC HOLDINGS,
INC., a New Jersey corporation;
JEREMY D. KRAUS; SAMUEL
COHEN; NCI HOLDINGS, INC., a
Nevada corporation,

Defendants,

and

JON R. MARPLE; GRATEFUL
INTERNET ASSOCIATES, LLC, a
Colorado limited liability company,

Defendants–Appellants.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:03-CV-914-DAK)**

---

Richard O. Weed, Weed & Co. LLP, Newport Beach, California, for the
Defendants–Appellants.

Christopher Paik (Brian G. Cartwright and Eric Summergrad, with him on the
brief), Securities and Exchange Commission, Washington, DC, for the
Plaintiff–Appellee.

---

Before **LUCERO**, **HOLLOWAY**, and **EBEL**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

In this civil enforcement action, the Securities and Exchange Commission ("Commission" or "SEC") charged that Jon R. Marple ("Marple") and Grateful Internet Associates, LLC ("Grateful"),[1] violated Section 10(b) of the Securities Exchange Act of 1934 ("§ 10(b)"), 15 U.S.C. § 78j(b); Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5; and Section 17(a) of the Securities Act of 1933 ("§ 17(a)"), 15 U.S.C. § 77q(a), in relation to material misstatements and omissions contained within a public company's periodic financial reports filed with the Commission.  Marple, who was a non-employee consultant to the public company, drafted the relevant filings on the company's behalf and otherwise played a significant role within the company.  Finding that Marple and Grateful could be treated as primary violators of the securities laws based on the contents of the filings which Marple drafted, the district court granted summary judgment to the Commission on each cause of action pursued.

Defendants appeal that decision, principally arguing that they cannot be held liable under the securities antifraud statutes because the Commission failed to show that Marple, rather than the public company itself, made the material misstatements and omissions.  We disagree and hold that when a non-employee consultant causes misstatements or omissions within periodic financial reports

_____

[1] Marple is the managing member of Grateful, a Colorado limited liability company named as a co-defendant in this case on all claims pursued by the Commission against Marple.  Because there is no allegation that Grateful has a corporate identity separate from Marple, we consider all claims against defendants-appellants jointly.

submitted to the Commission, knowing that those misstatements or omissions will reach investors, he can be held primarily liable under the antifraud provisions of the federal securities laws. Exercising jurisdiction under 28 U.S.C. § 1291, we therefore affirm the judgment of the district court.

## I

Before delving into the specific, complicated facts of this case, we set forth a brief overview of the broader fraud alleged by the SEC against the various defendants named below. In 2002, F10 Oil and Gas Properties, Inc. ("F10"), a public company, entered into an agreement with Sukumo Limited ("Sukumo") related to the sale of newly issued F10 stock.[2] The parties agreed that Sukumo would purchase up to 10 million shares of F10 stock, but only as it was able to sell such shares to overseas investors.[3] Although Sukumo ostensibly acted only as an intermediary in the sale of these new shares, the parties contracted to allow Sukumo, rather than F10, to retain the vast majority of the proceeds generated from Sukumo's sales of the stock to overseas investors. Under the agreement,

---

[2] F10 traded on the Over-The-Counter Bulletin Board ("OTCBB") until January 2004. F10 was then renamed GFY Foods, Inc., and Marple continued to provide consulting services to GFY Foods until at least March 2005.

[3] According to F10's 2003 10-KSB, the Offshore Stock Purchase Agreement with Sukumo qualified for an exemption under Regulation S of the Securities Act of 1993. That regulation permits the sale of securities not registered with the Commission in certain offshore transactions, including sales to a non-U.S. person. See 17 C.F.R. § 230.901; Geiger v. SEC, 363 F.3d 481, 486 (D.C. Cir. 2004).

only 12.5% of the money raised by Sukumo was actually designated for payment to F10; Sukumo pocketed a full 70%, and the remaining 17.5% was paid to Allen Wolfson and his son David, who brokered the original deal between Sukumo and F10.

Marple's connection to this scheme arises out of his relationship to F10. As a non-employee consultant, he drafted periodic financial reports on behalf of F10, which were ultimately filed with the Commission during the time Sukumo was selling F10 stock. Those reports failed to, among other things, appropriately disclose the nature of F10's agreement with Sukumo and the relevant distribution of proceeds between the various parties.

**A**

From 2001 to 2003, Marple worked as a non-employee consultant to F10. Jon H. Marple, Marple's father ("Marple, Sr."), served as F10's Chief Executive Officer, and Mary Blake, Marple's stepmother, served as the company's Chief Financial Officer.[4] Marple signed a formal agreement with F10 in February 2002, in which he contracted to provide various consulting services ("Consulting Agreement"). Two of these services are relevant to the instant appeal. First, Marple agreed to present F10 with any "strategic partnerships, acquisition candidates or other business opportunities within of [sic] interest to F10" of

---

[4] As of March 31, 2003, Marple, Sr. and Blake were the only full-time employees of F10.

which he became aware.  Second, Marple agreed to provide, "where requested, assistance in the preparation of F10's filings with [the Commission] and . . . in compiling, preparing and consolidating the financial statements of F10 for quarterly and annual reports."  Marple had prior experience preparing filings for the Commission, having served as president of an OTCBB company and as a consultant to other OTCBB companies.[5]  Under the agreement, Marple would be compensated for these services by a combination of salary, stock, and stock options.  In addition, if F10 closed on any business opportunity that Marple brought to its attention, he would receive a finder's fee equal to 10% of that opportunity's value.

As part of his consulting duties, Marple introduced his father, Marple Sr., to Allen Wolfson in early 2002.  At the time of the introduction, Wolfson was associated with Sukumo, an offshore "boiler room" operation.[6]  Wolfson

---

[5] Marple stipulated to the fact that "[h]e knew that the public and investors relied on [such filings] and their accuracy was important as such . . . ."  But, as Marple understood his obligations under the Consulting Agreement, F10's auditors and attorneys would review the company's draft Commission filings.

[6] In securities parlance, the term "boiler room" is typically used to describe a telemarketing operation in which salespeople call lists of potential investors in order to peddle speculative or fraudulent securities.  A broker using so-called "boiler-room tactics" generally gives customers a high-pressure sales pitch containing misleading information about the nature of the investment, as well as the broker's own commission on the sale.  See, e.g., United States v. Becker, 502 F.3d 122, 125 (2d Cir. 2007); see also Black's Law Dictionary 168 (8th ed. 2004) (defining "boiler-room transaction" as "[a] high-pressure telephone sales pitch, often of a fraudulent nature").

orchestrated a contract between F10 and Sukumo, whereby F10 agreed to sell Sukumo up to 10 million shares of F10 stock. Sukumo was, however, under no obligation to purchase any or all of the shares contemplated by the agreement, and Sukumo's primary objective was to sell as many of the shares as possible to overseas investors at full bid price.

In accordance with the parties' arrangement, Sukumo retained 70% of the proceeds from its sales of F10 stock and remitted the remaining 30% to an escrow account designated by the parties. Wolfson and several entities controlled by him and his son David (the "Wolfson entities"), contracted to receive 17.5% of the total sale proceeds, which were to be paid from the escrow account. F10 would receive the remaining 12.5% of the proceeds. But because he had introduced Wolfson to F10, Marple was entitled to a finder's fee under the Consulting Agreement, and F10 paid Marple 10% of its portion of the proceeds (or 1.25% of the total sale price) through his company Grateful. F10 thereby retained only 11.25% of the total sales price as new capital.

Sukumo began selling F10 stock to investors in the United Kingdom, Australia, and New Zealand in late January or early February 2003. From that time until September 2003, when sales ceased, F10 received approximately $695,000 from the offerings, and Marple, through Grateful, received

approximately $62,000.[7]  Sukumo made $3.2 million from the sale of F10 stock

over this same period.

Given its impact on F10's financial affairs, F10 was required to disclose the

arrangement with Sukumo in its publicly-filed periodic financial reports.  At

F10's request and in accordance with the Consulting Agreement, Marple prepared

draft versions of two such filings, which together form the gravamen of the

Commission's complaint against him and Grateful.  First, Marple drafted F10's

quarterly filing ("10-QSB") for the three months ending on December 31, 2002,

as well as the balance sheet contained within that filing.  Second, he prepared the

draft of F10's annual Commission filing ("10-KSB") for 2002.

With respect to the 10-QSB, independent auditors reviewed Marple's draft,

and Marple, Sr. and Blake certified the form's accuracy in their respective

capacities as CEO and CFO.  F10's counsel, however, did not review the form,

and according to Marple, Sr. and Blake, they did not make any changes to the

portions of the filing describing the Sukumo arrangement.  The final version of

the 10-QSB disclosed that F10 had "issued" 10 million shares of stock to Sukumo

and that F10 would receive approximately 12.5% of its bid price per share.  It did

not, however, disclose that Sukumo would keep 70% of the proceeds on the stock

---

[7] Between December 2002 and October 2003, F10 paid Marple an additional $82,499.55 in consulting fees and expenses.  Marple also sold some of his F10 stock, worth approximately $4,900.  All told, Marple made nearly $150,000 from his relationship with F10 during this time period.

sales or that Sukumo was under no obligation to purchase any of the 10 million shares. The filing further failed to reveal that 17.5% of the offering proceeds went to the Wolfson entities and another 1.25% was paid to Grateful. In other words, although the 10-QSB made it appear that F10 would receive payment for the shares purchased by Sukumo, in fact, Sukumo, Wolfson, and Grateful were to receive 88.75% of the proceeds from the boiler room's sales.

At F10's request, Marple also drafted F10's 10-KSB for the fiscal year ending March 31, 2003. That filing discussed the Sukumo arrangement and included some of the information that was omitted from the prior 10-QSB. For example, the 10-KSB disclosed that the Wolfson entities received 17.5% of the proceeds from Sukumo's sales of F10 stock, and that Marple received a 10% finder's fee. It did not, however, disclose that Sukumo was under no obligation to purchase any F10 stock, despite the fact that Marple had agreed with F10's independent auditors to present that information in the filing.[8] The draft 10-KSB was again certified as accurate by F10's CEO and CFO prior to filing with the Commission.

At the time he prepared the 10-KSB—and prior to the filing date of the 10-QSB—Marple was aware of Sukumo's sales of F10 stock to overseas investors. As early as January 22, 2003, he was the primary recipient of emails

---

[8] The agreement between F10 and Sukumo was attached as an exhibit to F10's 2003 10-KSB. It stated that Sukumo was buying shares for its own account or for accounts over which it had discretionary authority.

from the designated escrow agent detailing the distribution of funds received by Sukumo from its sales of F10 stock.

In addition to preparing the company's financial statements and related SEC filings, Marple took on other responsibilities at F10. For example, Marple assisted in the company's bookkeeping and prepared draft press releases and corporate resolutions, which Marple, Sr. and Blake would review and approve. He further participated in the analysis of potential oil and gas investments, despite having no prior experience in the oil and gas industry. After Marple, Sr. suffered a massive heart attack in November 2002, Marple also stepped into his father's role and negotiated with several noteholders to either settle or restructure their ventures with F10.

**B**

Once it learned of Sukumo's offshore boiler-room operation, the Commission's Division of Enforcement launched an investigation into Sukumo and Wolfson. That investigation ultimately led the Commission to F10 and several other U.S.-based companies, and on October 16, 2003, the Commission brought a civil enforcement action against numerous defendants, including Marple and Grateful.[9] In its complaint, the Commission alleged that Marple and Grateful: (1) committed fraud in violation § 10(b) and Rule 10b-5; (2) employed a device,

---

[9] The Commission's complaint named several defendants, including at least nine individuals and eleven corporate entities. This appeal relates only to Marple and his company, Grateful.

- 10 -

scheme, or artifice to defraud in violation of § 17(a)(1); and (3) committed fraud in the offer and sale of securities in violation of § 17(a)(2) and (3).[10]

Following discovery, the Commission and Marple filed a "Joint Stipulation of Facts" with the district court, which generally included the facts recounted above. Thereafter, on April 20, 2005, the Commission moved for summary judgment against Marple and Grateful on each cause of action, relying principally on the stipulated facts. Marple responded with his own motion for summary judgment a month later, arguing that neither he nor Grateful could be held liable, as a matter of law, for the alleged violations of the federal securities laws. In August 2005, with the cross-motions for summary judgment pending before the district court, Marple and Grateful also filed a motion for judgment on the pleadings, or in the alternative, a motion to dismiss for failure to state a claim.

In November 2005, the district court granted the Commission's motion for summary judgment and denied Marple's motions for summary judgment and for judgment on the pleadings. As to the merits of the Commission's claims, the court concluded that "the undisputed facts establish that [Marple and Grateful] knowingly committed fraud in connection with the offer, purchase, or sale of F-10 stock." It found that Marple had prepared drafts of F10's filings with the Commission and that these filings "contained untrue statements or omitted

---

[10] Although the Commission's complaint also alleged that Marple was involved in a scheme to manipulate the price of F10 stock, see 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5, it later withdrew that cause of action.

material facts with regard to F-10's agreements with Sukumo, the Wolfson entities, and J.R. Marple." It further found that Marple himself made the relevant untrue statements and omissions, and that he did so knowingly and in connection with the purchase or sale of securities. The district court thus determined that Marple and Grateful were liable for F10's misstatements and omissions under § 10(b), Rule 10b-5, and § 17(a). In light of its conclusion that the Commission was entitled to summary judgment, the district court also concluded that Marple's motion for judgment on the pleadings was moot.

As a result of these violations, the court entered a permanent injunction against Marple and Grateful, barring them from future violations of § 10(b), Rule 10b-5, and § 17(a). It also ordered defendants to disgorge $149,530.45 in ill-gotten gains, to pay prejudgment interest in the amount of $21,463.27, and to pay a civil penalty of $100,000. This timely appeal followed.

**II**

We review the district court's grant of summary judgment de novo. SEC v. Cochran, 214 F.3d 1261, 1264 (10th Cir. 2000). Viewing the evidence, as well as all reasonable inferences derived therefrom, in the light most favorable to defendants, we must ascertain whether there is any genuine issue of material fact and whether the Commission is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); SEC v. Pros Int'l, Inc., 994 F.2d 767, 769 (10th Cir. 1993).

Marple and Grateful do not dispute any of the relevant material facts. Rather, they argue that under these facts, they cannot be held <u>primarily</u> liable under § 10(b) and Rule 10b-5 because they did not directly or indirectly engage in any manipulative or deceptive acts. Specifically, they claim that the Commission showed only that F10 made the material misstatements or omissions, not that they as individuals "made" such misstatements or omissions. Marple and Grateful were, according to their theory, mere secondary actors subject at most to liability as aiders and abettors. Alternatively, they argue that, even if they were responsible for the misstatements or omissions in F10's 10-KSB and 10-QSB, those misstatements or omissions lacked the requisite nexus to any securities transactions. In other words, they urge that the SEC failed to prove that the misstatements or omissions occurred "in connection with the purchase or sale" of securities, as required by § 10(b), or "in the offer or sale of" securities, as mandated by § 17(a). Finally, as to the claim pursued under § 17(a)(2), defendants maintain that the Commission failed to show that they "obtain[ed] money or property by means of" a material misstatement or omission because the Commission failed to show that defendants made any such statement or omission. As we will explain, each of these arguments lacks merit.

**A**

We begin with the question of primary liability under § 10(b) and Rule 10b-5. Under § 10(b), Congress has made it

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . . (b) To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Acting in accordance with its authority under this statute, the

Commission has promulgated Rule 10b-5, which makes it

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (emphasis added).  In an SEC enforcement action such as

this one, based on alleged misstatements or omissions contained in public filings,

a defendant is liable under § 10(b)[11] if the Commission establishes that he

(1) made a misrepresentation or omission (2) of material fact, (3) with scienter,

(4) in connection with the purchase or sale of securities, and (5) by virtue of the

---

[11] "The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)," SEC v. Zandford, 535 U.S. 813, 816 n.1 (2002), and we therefore use "§ 10(b)" throughout the remainder of this opinion to refer to both the statute and the rule. See also United States v. O'Hagan, 521 U.S. 642, 651 (1997) ("Liability under Rule 10b-5, our precedent indicates, does not extend beyond conduct encompassed by § 10(b)'s prohibition.").

- 14 -

requisite jurisdictional means.  See Geman v. SEC, 334 F.3d 1183, 1192 (10th

Cir. 2003).  Unlike private litigants proceeding under § 10(b), "[t]he SEC is not

required to prove reliance or injury in enforcement actions."  Id. at 1191.

Section 17(a) requires substantially similar proof.  See SEC v. First Jersey

Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996).  Under that statute, it is

> unlawful for any person in the offer or sale of any securities . . . by
> the use of any means or instruments of transportation or
> communication in interstate commerce or by use of the mails,
> directly or indirectly
> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of
> a material fact or any omission to state a material fact necessary in
> order to make the statements made, in light of the circumstances
> under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business
> which operates or would operate as a fraud or deceit upon the
> purchaser.

15 U.S.C. § 77q(a).  The principal difference between § 17(a) and § 10(b) lies in

the element of scienter, which the SEC must establish under § 17(a)(1), but not

under § 17(a)(2) or § 17(a)(3).[12]  Aaron v. SEC, 446 U.S. 680, 697 (1980).  By

contrast, § 10(b) always requires a showing of scienter.

"The purpose of both [§ 10(b) and § 17(a)] is protection of investors from

fraudulent practices."  SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 26 (10th Cir.

1972).  In cases of alleged misstatements in public filings submitted to the

---

[12] As discussed infra in Section II.B, under § 17(a), the Commission must prove that the fraud occurred "in the offer or sale of any securities," rather than "in connection with the purchase or sale of any security."  Compare 15 U.S.C. § 77q(a), with § 78j(b).

- 15 -

Commission, the scope of the two sections is essentially coextensive because the fraudulent conduct touches upon both purchases and sales of publicly-traded securities. See, e.g., SEC v. Power, 525 F. Supp. 2d 415, 419-20 (S.D.N.Y. 2007). We address defendants' arguments against primary liability under both § 10(b) and § 17(a) together because their contentions under those statutes are essentially the same: Neither Marple nor Grateful can be held liable for securities fraud because it was F10, rather than themselves, that made actionable misstatements or omissions.

At issue in this appeal are only the first and fourth elements of the antifraud statutes. We therefore consider only whether defendants made the relevant misrepresentations or omissions, and whether those misrepresentations or omissions had the required nexus to a securities transaction.

**1**

The modern concept of primary liability for violations of the federal antifraud securities laws—as well as the debate surrounding it—can be traced back to the Supreme Court's decision in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994). There, the Court held that private civil liability under § 10(b) did not extend to those who merely aid and abet the commission of a manipulative or deceptive act, or the making of a material misstatement or omission, in connection with the purchase or sale of

- 16 -

securities.[13]  Id. at 166-67.  Instead, liability under § 10(b) was limited in its reach

to "only the making of a material misstatement (or omission) or the commission

of a manipulative act."  Id. at 177-78.  In foreclosing liability for aidors and

abettors under § 10(b), the Court hewed to the statutory text.  It reasoned that

because the text did not reach aiders and abettors, private litigants could not

pursue such a cause of action under the auspices of the statute.  Id.  The Court

emphasized, however, that so-called "primary liability" could reach secondary

actors, such as accountants, lawyers, or bankers, in certain cases:

> The absence of § 10(b) aiding and abetting liability does not mean
> that secondary actors in the securities markets are always free from
> liability under the securities Acts.  Any person or entity, including a
> lawyer, accountant, or bank, who employs a manipulative device or
> makes a material misstatement (or omission) on which a purchaser or
> seller of securities relies may be liable as a primary violator under
> 10b-5, assuming all of the requirements for primary liability under
> Rule 10b-5 are met.

Id. at 191.  In other words, the Court recognized that secondary actors could be

held liable under the statute so long as they themselves made a material

misstatement or omission (or committed some other fraudulent act), and each of

---

[13] Following the Court's decision in Central Bank, Congress passed the Private Securities Litigation Reform Act of 1995, which allows the Commission, but not private litigants, to pursue a cause of action against aiders and abettors of fraudulent acts under the securities laws.  See 15 U.S.C. § 78t(e) ("[A]ny person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.").  The Commission has chosen not to proceed against Marple and Grateful under the aiding and abetting statute.

the remaining elements of liability under § 10(b) are satisfied.  Id.; see also

Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226 (10th Cir. 1996).

Recognizing the dichotomy between primary liability and aiding and

abetting liability created by Central Bank, the Commission alleges that Marple

and Grateful are primary violators of § 10(b).  Thus, the question we confront

today is whether the acts committed by Marple and Grateful are sufficient to show

that they "made" the material misstatements and omissions contained within

F10's SEC filings, such that they can be held primarily liable.

We previously faced a similar question in Anixter, one of the first circuit

court decisions to grapple with the impact of Central Bank in the context of a

private, as opposed to public, securities lawsuit.[14]  In Anixter, we considered

whether a secondary actor, an accountant, could be held primarily liable under

§ 10(b) for his participation in preparing several documents disseminated to the

public.  Those documents, including registration statements filed with the

Commission, program books, prospectuses, and certifications and opinion letters,

all falsely verified his client's financial well-being.  Id. at 1219.  We concluded,

in accordance with Central Bank, that the accountant could be held liable for a

primary violation of § 10(b) under those facts.  Id. at 1226-27.  We held "that in

_____

[14] A private litigant proceeding under § 10(b) bears a more onerous burden of proof than the SEC does when it pursues a public enforcement action.  In addition to proving the elements set forth above in Section II.A, a private litigant must also show reliance on the fraud and the existence of damages or injury suffered as a result thereof.  See, e.g., Anixter, 77 F.3d at 1225.

- 18 -

order for accountants to [be primarily liable under § 10(b)], they must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors." Id. at 1226. We reasoned that because the accountant, as the company's auditor, had prepared many of the offending documents, and because he knew or should have known that the documents would reach investors who would in turn rely upon them, a jury could deem him a primary violator of the antifraud provisions at issue. Id. at 1227.

But our holding in Anixter has not been universally adopted. Several other federal courts have embraced distinct tests for determining whether a secondary actor, such as Marple, can be held primarily liable in the wake of Central Bank. Because the parties refer us to these other tests for judging primary liability, we briefly set forth two tests that are relevant to our analysis today.

First, at least two circuits have adopted the so-called "bright-line" test—an inquiry largely similar to the one adopted by this court in Anixter, except that it includes an additional element. Under the bright-line test, a secondary actor is primarily liable for securities fraud if the actor makes a material misrepresentation (or omission), and the relevant misrepresentation is attributed to the secondary actor at the time it is disseminated to investors. See, e.g., Ziemba v. Cascade Int'l Inc., 256 F.3d 1194, 1205 (11th Cir. 2001); Wright v. Ernst & Young, LLP, 152 F.3d 169, 175 (2d Cir. 1998). Attribution is required under this theory because a plaintiff in a private securities action must prove

reliance on the misrepresentations or omissions at issue.  See Wright, 152 F.3d at 175 (reasoning that without an attribution requirement, the court would be forced to "circumvent the reliance requirements of the act, as '[r]eliance only on misrepresentations made by others cannot itself form the basis of liability'" (quoting Anixter, 77 F.3d at 1225)).[15]

In contrast with the bright-line theory of primary liability, at least one circuit has adopted the less-demanding "substantial participation" test.  Under this inquiry, a secondary actor can be held liable as a primary violator of § 10(b) if the actor substantially participates or is intricately involved in making the material misstatement or omission.  See, e.g., In re Software Toolworks, Inc. Sec. Litig., 50 F.3d 615, 628 n.3 (9th Cir. 1994) (holding accountants primarily liable under § 10(b) as a result of their "significant role in drafting and editing" letters sent to the Commission); see also Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) ("[W]e have held that substantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements.").  We explicitly rejected the substantial participation test in Anixter as inconsistent with the Supreme Court's holding in Central Bank.  See

_____

[15] Under both this circuit's test and the bright-line test, "[t]here is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach."  Wright, 152 F.3d at 175 (quoting Anixter, 77 F.3d at 1226).

<u>Anxiter</u>, 77 F.3d at 1226 n.10 ("To the extent these cases allow liability to attach without requiring a representation to be made by defendant, and reformulate the 'substantial assistance' element of aiding and abetting liability into primary liability, they do not comport with <u>Central Bank of Denver</u>.").[16]

**2**

According to Marple and Grateful, we should extend the bright-line test from the realm of private securities litigation to SEC enforcement actions. Because any misstatements or omissions in F10's 10-QSB and 10-KSB were not specifically <u>attributed</u> to Marple, defendants argue that they cannot be held liable under § 10(b) and § 17(a). Under this theory of the case, because the filings were attributed to F10, it is the only actor who may be held liable. Because this argument fails to accord with applicable precedent as well as the logical underpinnings of the bright-line test's attribution requirement, we reject it.

To begin with, defendants' argument is without support in the caselaw of this circuit. We have never adopted an attribution requirement in a private securities case, let alone in a Commission enforcement action. More to the point,

---

[16] Other courts have adopted an intermediate approach, embracing the so-called "creation" test. Under this inquiry, a secondary actor can be held liable as a primarily violator when the actor "creates" a misrepresentation, even one ultimately disseminated by others and never publicly attributed to the creator. <u>See, e.g.</u>, <u>In re Enron Corp. Sec., Derivative, & ERISA Litig.</u>, 235 F. Supp. 2d 549, 586-91 (S.D. Tex. 2002) (adopting the SEC's argument that, in a private securities litigation, "when a person, acting alone or with others, creates a misrepresentation on which the investor-plaintiffs relied, the person can be liable as a primary violator if he acts with the requisite scienter" (alterations omitted)).

the attribution requirement of the bright-line test stems directly from the need for private litigants to prove reliance on an alleged fraud to succeed on a private cause of action. See Wright, 152 F.3d at 175 ("[A] secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination. Such a holding would circumvent the reliance requirements of the Act . . . ."). Requiring the government to prove attribution in a public enforcement action thus directly conflicts with our jurisprudence recognizing that the SEC need not plead and prove reliance in a § 10(b) case. See Geman, 334 F.3d at 1191. Thus, given the unambiguous connection between reliance and attribution, and the fact that the SEC need not prove reliance, we decline to impose an attribution element in an SEC enforcement action.[17] See SEC v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 490 (S.D.N.Y. 2007); SEC v. KPMG, LLP, 412 F. Supp. 2d 349, 375 (S.D.N.Y. 2006); but see SEC v. Lucent Tech., Inc., 363 F. Supp. 2d 708, 724 (D.N.J. 2005) (extending the bright-line test to an SEC enforcement action because "it more clearly delineates which types of behavior will give rise to primary liability versus secondary liability").

Given our conclusion that the SEC need not establish attribution in an enforcement action under either § 10(b) or § 17(a), the mere fact that the

[17] As under § 10(b), the Commission need not prove reliance in a civil enforcement action under § 17(a). See, e.g., Kramas v. Security Gas & Oil Inc., 672 F.2d 766, 770 (9th Cir. 1982); United States v. Amick, 439 F.2d 351, 366 (7th Cir. 1971).

misstatements and omissions present in F10's 10-QSB and 10-KSB were not publicly attributable to Marple does not mean that Marple and Grateful cannot be held primarily liable. We must instead decide whether defendants "made" the misstatements or omissions at issue, notwithstanding the lack of attribution. On this score, we find a recent opinion of the Seventh Circuit, as well as several similar decisions from the Southern District of New York, persuasive.

In McConville v. SEC, 465 F.3d 780 (7th Cir. 2006), the Seventh Circuit reviewed the Commission's administrative determination that the former chief financial officer of a publicly-traded company was liable under Rule 10b-5. There, the company failed to disclose the substantial impairment of its accounts receivable in its 10-K filing with the Commission, and it was shown that the chief financial officer was involved in preparing the filing. Id. at 786-88. According to the court, the relevant question in determining the CFO's liability was "whether she caused [the company] to make material misstatements to the investing public." Id. at 787 (emphasis added). Because the defendant had "drafted and reviewed the core financial statement that overestimated [the company's] profits," "reviewed and approved a draft of the 10-K that consisted of the inaccurate core financial statements," and represented that the financial statements were accurate to the company's independent auditor, she could properly be held liable under § 10(b) for false statements present in the filing. Id. at 787-88.

Similarly, in KPMG, a district court considered whether the engagement partners of an independent auditing firm "made" misstatements contained within an audit opinion issued in the name of their firm, such that primary liability could attach. 412 F. Supp. 2d at 371-78. Like the Seventh Circuit, the district court held that "so long as the SEC is able to show that the defendant[s] [were] sufficiently responsible for the statement—in effect, caused the statement to be made—and knew or had reason to know that the statement would be disseminated to investors," they could be held primarily liable under § 10(b) and § 17(a). Id. at 375 (emphasis added). It then reasoned that in light of the engagement partners' central role in preparing the audit opinions and their authority to issue those opinions, primary liability under § 10(b) and § 17(a) was proper. Id. at 376; see also SEC v. Power, 525 F. Supp. 2d 415, 420 (S.D.N.Y. 2007); Collins & Aikman Corp., 524 F. Supp. 2d at 490.

Like the defendants in KPMG and McConville, Marple played an integral role in preparing those filings that contained the misstatements and omissions at issue here. Not only did he prepare the drafts of both the 10-QSB and 10-KSB, the draft of the 10-QSB (the more misleading of the two filings) was not modified by either F10's CEO or CFO, at least insofar as the Sukumo arrangement was portrayed. It was filed as Marple drafted it. Additionally, F10 hired Marple for the very purpose of preparing the relevant SEC filings, based on his prior financial reporting experience, and he well knew that those documents would be

- 24 -

distributed to the public and available to investors. That the filings were issued in F10's name, and that Marple himself did not sign, certify, or physically file the documents, is not dispositive. The relevant question is only whether he can fairly be said to have caused F10 to make the relevant statements, and whether he knew or should have known that the statements would reach investors. See McConville, 465 F.3d at 787; see also Anixter, 77 F.3d at 1226 ("There is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs for primary liability to attach.").[18] Under the facts discussed, this standard was satisfied. We thus hold that because Marple caused the misstatements and omissions to be made, and knew that the statements were calculated to reach investors, defendants can properly be held liable under § 10(b) and § 17(a) for those misstatements and omissions.[19] See McConville, 465 F.3d

_____

[18] As we view the matter, this standard is not inconsistent with our previous rejection of the substantial participation test embraced by the Ninth Circuit in the private securities litigation realm. See Anixter, 77 F.3d at 1226 n.10. Under the rule articulated today, a defendant must do more than substantially participate in creating an actionable misstatement (or omission); he must instead be so involved in creating or communicating the offending misstatement (or omission) that he can fairly be said to have caused it to be made.

[19] Under the circumstances of this case, we accord no significance to the fact that Marple was styled as a "consultant" to F10, rather than a member of its management team. See SEC v. Softpoint, Inc., 958 F. Supp. 846, 862 (S.D.N.Y. 1997) (holding a defendant liable under § 10(b) and § 17(a) where "[a]s a consultant to Softpoint, [he] helped prepare and disseminate an array of press releases, Form 10-KSB annual reports, Form 10-QSB quarterly reports, and Form S-8 registration statements, containing material misrepresentations and omissions about Softpoint's finances."). Far from being a typical outsider to the company,
(continued...)

at 787; Power, 525 F. Supp. 2d at 420; Collins & Aikman Corp., 524 F. Supp. 2d at 490; KPMG, 412 F. Supp. 2d at 375.

**B**

Defendants next contend that they cannot be held liable under § 10(b) because there is no evidence that the fraud was committed "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Similarly, they argue that the SEC failed to present any evidence that the fraud was perpetrated "in the offer or sale of any securities," as required by § 17(a). 15 U.S.C. § 77q(a). They essentially urge that the relevant evidence points toward Sukumo and David Wolfson committing a fraud on investors in relation to the sale of F10 stock, but that F10's filings had no effect on investors' decisions to transact in F10 stock. Again, we are not persuaded by their reasoning.

**1**

The Supreme Court has consistently embraced an expansive reading of § 10(b)'s "in connection with" requirement. Most recently, in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006), the Court recognized

---

[19](...continued)
the record demonstrates that Marple played a central role in the management of F10, akin to that of a core member of management. For example, when Marple, Sr. suffered a major heart attack, Marple stepped into his father's role and negotiated with note holders to either settle or restructure their ventures with F10. He also analyzed potential business opportunities in the oil and gas industry, regularly interfaced with F10's independent auditors as a representative of the company, and was responsible for introducing Marple, Sr. to Alan Wolfson.

that "it has espoused a broad interpretation" of this element of § 10(b) liability, and stated that "it is enough that the fraud alleged 'coincide' with a securities transaction." Id. at 85; see also Zandford, 535 U.S. at 819 ("In its role enforcing the Act, the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'"). The Court has also indicated that "the statute should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." Zandford, 535 U.S. at 819 (quotation omitted). In this circuit, we have held that this element requires only that there be "a causal connection between the allegedly deceptive act or omission and the alleged injury." Arst v. Stifel, Nicolaus & Co., Inc., 86 F.3d 973, 977 (10th Cir. 1996) (citations omitted). Nevertheless, we have not yet had occasion to address how the "in connection with" element applies when the allegations of fraud stem from misrepresentations contained within documents publicly available to investors.

In this context, several of our sister circuits have recognized that "[w]here the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993); see also Semerenko v. Cendant Corp., 223 F.3d 165, 176 (3d Cir.

2000); <u>SEC v. Savoy Indus., Inc.</u>, 587 F.2d 1149, 1171 (D.C. Cir. 1978); <u>SEC v. Texas Gulf Sulphur Co.</u>, 401 F.2d 833, 861-62 (2d Cir. 1968) (en banc). These courts reason that because such documents are designed to reach investors and to influence their decisions to transact in a publicly-traded security, any misrepresentations contained within the documents are made "in connection with" the purchase or sale of that security. <u>See, e.g.</u>, <u>Texas Gulf Sulphur Co.</u>, 401 F.2d at 862; <u>McGann v. Ernst & Young</u>, 102 F.3d 390, 397 (9th Cir. 1996).

In such cases, the SEC need only show that the documents are reasonably calculated to influence investors, and that the misrepresentations are material to an investor's decision to buy or sell the security. <u>See</u> <u>Rana Research</u>, 8 F.3d at 1362. A misstatement or omission is material if there is a substantial likelihood that a reasonable investor would consider the information significant when making an investment decision. <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988). Because this interpretation of the "in connection with" element is consistent with the Supreme Court's relatively broad construction and our circuit's own requirement that there be a causal connection between the fraud and the injury, we join those circuits that have adopted this analysis. <u>See also</u> <u>United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.</u>, 210 F.3d 1207, 1221 (10th Cir. 2000) (holding that misrepresentations made to induce a party to purchase a security or to influence an investment decision are made "in connection with the purchase or sale of a security").

Turning to the record before us, we conclude that the alleged misrepresentations and omissions contained within the 10-KSB and 10-QSB filed by F10 are statements made "in connection with" the purchase or sale of securities. First, these documents, like all periodic financial reports filed with the Commission, were plainly designed to reach investors. As a consultant experienced in preparing SEC filings, Marple very well knew that the statements contained in the 10-KSB and 10-QSB would be communicated to investors—after all, they were public documents meant to provide investors with a periodic report on F10's financial affairs. Second, the filings were unquestionably material to investors' decisions to transact in F10's stock. A potential investor, weighing the decision to purchase a particular security, would have considered the amount of capital that F10 would receive, as well the distribution of proceeds amongst the participating entities, significant to making an informed investment decision related to F10 stock. The information omitted from the filings—particularly the 10-QSB—prevented investors from fully appreciating that the bulk of the proceeds from Sukumo's sales of F10 stock would go to entities other than F10, or understanding what Sukumo intended to do with the stock it was allegedly "purchasing" from F10. We thus conclude that the record establishes that defendants' misstatements and omissions were made "in connection with" the purchase or sale of securities.

2

We turn then to defendants' related argument, in which they claim that they cannot be held liable under § 17(a) because the Commission failed to meet the nexus requirement of that antifraud statute. Like § 10(b), § 17(a) requires a connection between the fraud alleged and a securities transaction; it mandates that the fraud be committed "in the offer or sale" of securities. 15 U.S.C. § 77q(a). To decide this case, however, we need not exhaustively consider the scope of this requirement, nor determine whether it imposes a burden distinct from § 10(b)'s "in connection with" element. See United States v. Naftalin, 441 U.S. 768, 773 n.4 (1979) (stating that the Supreme Court has often used § 17(a)'s phrase "in" interchangeably with § 10(b)'s phrase "in connection with"). It suffices to note here that Marple's misconduct occurred "in the offer or sale" of securities because the relevant misstatements were contained in filings available to the public at the time Sukumo offered and sold F10 stock to overseas investors. The misstatements and omissions were also material to a reasonable investor's decision to purchase the stock sold by Sukumo, as they concerned the manner in which funds provided to Sukumo would be distributed. It can thus fairly be said that the misstatements or omissions in this case occurred "in the offer or sale" of securities, and that this element of § 17(a) was satisfied. See Softpoint, Inc., 958 F. Supp. at 863 (holding that the nexus requirement of § 10(b) and § 17(a) was satisfied where it was shown that material misrepresentations and omissions were included in public documents filed with the Commission).

Marple and Grateful alternatively suggest that unless a defendant is an actual seller or offeror of securities, liability cannot attach under any of § 17(a)'s three subsections.[20] We simply do not read § 17(a)'s nexus requirement so strictly, and neither have any of the courts that have considered the statute in misstatement cases. See,e.g., SEC v. Holschuh, 694 F.2d 130, 142 (7th Cir. 1982) (recognizing that "actual or first-hand contact with offerees or buyers [is not] a condition precedent to primary liability for antifraud violations"); SEC v. Am. Commodity Exch., 546 F.2d 1361, 1366 (10th Cir. 1976) (rejecting a similar argument because "actual sales [are] not essential" for liability to attach under § 17(a) and § 10(b)); Power, 525 F. Supp. 2d at 419-20 ("A public company and its management may violate [§ 17(a)] by making a material misstatement in, or omitting requisite material information from, a periodic report, registration statement, or other filing with the Commission."); see also SEC v. Solucorp Indus., Ltd., 274 F. Supp. 2d 379, 418-19 (S.D.N.Y. 2003) (finding a corporation's executives liable under § 17(a) and § 10(b) where the SEC established that the "executives engaged in a course of deception through the issuance of false and misleading press releases and financial statements"). As we have noted, the misrepresentations or omissions in this case were made on behalf

---

[20] As the sole support for their argument that § 17(a) applies only to "sellers" of securities, defendants cite to the Supreme Court's decision in Aaron v. SEC, 446 U.S. 680, 687 (1980), which noted that the section "applies to both buyers and sellers." The opinion, however, does nothing to strictly limit § 17(a) liability only to the literal buyers and sellers of securities.

of the issuer, concerned the use of the proceeds of the stock sale, and were made while Sukumo was in the process of peddling newly issued F10 stock to investors. The challenged element of the statute was therefore satisfied by the evidence introduced below.

## C

In their last substantive argument, Marple and Grateful contend that there was no evidence that they "obtained money or property <u>by means of</u>" a material misstatement or omission and that they therefore cannot be liable under § 17(a)(2). Again, they suggest that F10, rather than Marple, made the relevant misstatements or omissions. But for the same reasons that defendants are primarily liable under § 10(b) for "making" the relevant misstatements and omissions, they are also liable under § 17(a)(2). Moreover, there can be no real question that they obtained money and property from their fraudulent acts. Pursuant to the terms of the Consulting Agreement, Marple received a fee for his efforts in preparing the offending 10-KSB and 10-QSB and obtained shares of F10 stock which he sold for approximately $4,900. For its part, Grateful was paid 1.25% of the proceeds from Sukumo's sales of F10 stock.

## III

We move to defendants' final issue on appeal: whether the district court erred in denying as moot their Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings. Defendants assert that the SEC's <u>complaint</u> fails as a

matter of law because it did not specifically set forth how their conduct violated either § 17(a) or § 10(b). Marple and Grateful, however, did not make their motion for judgment on the pleadings until after both parties filed motions for summary judgment, and they offer no legal authority explaining why the district court should have considered the motion for judgment on the pleadings before the cross-motions for summary judgment, which were filed with supporting evidence.

According to Rule 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial . . . ." Fed. R. Civ. P. 12(c). Although a motion for judgment of the pleadings can be filed at any time before trial, nothing in the language of the rule implies that the motion must be disposed of prior to other pending motions, including a motion for summary judgment. Moreover, when a motion for judgment on the pleadings is filed and "matters outside the pleadings are presented to and not excluded by the court, the motion <u>must</u> be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(d) (emphasis added).

In this case, Marple did not file his motion for judgment on the pleadings until after the parties had filed a joint stipulation of facts, the Commission had filed a motion for summary judgment with supporting evidence, and defendants themselves had moved for summary judgment. Why Marple waited to raise his motion for judgment on the pleadings until after the parties had each moved for summary judgment is not apparent from the record. What is obvious, however, is

that Marple never raised any objections to the complaint or otherwise sought a more particular statement of the allegations against him until two years after the complaint was filed and months after the parties had moved for summary judgment.

In light of this delay, we see no reason why the district court should have first ruled on the pending motion for judgment on the pleadings, when it concluded that the Commission was entitled to judgment as a matter of law based on the evidence presented in conjunction with the motions for summary judgment. For all purposes relevant to this case, the time for properly testing the sufficiency of the complaint had passed, and the Commission was entitled to judgment as a matter of law. Indeed, under Rule 12(d), the district court was obligated to decide the liability issues by reference to the admissible evidence presented by the parties, rather than solely by reference to the complaint's allegations. We therefore discern no error in the district court's denial of defendants' motion for judgment on the pleadings.

## IV

For the reasons stated, we **AFFIRM** the judgment of the district court.