FILED
United States Court of Appeals
Tenth Circuit

April 27, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff-Appellee,

v.

BRIAN J. SMART,

        Defendant-Appellant,

and

SMART ASSETS, LLC, a California
limited liability company.

        Defendant.

No. 11-4134

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:09-CV-00224-DAK)**

---

Submitted on the briefs:[*]

Brian J. Smart, Pro Se.

Mark D. Cahn, General Counsel; Michael A. Conley, Deputy General Counsel;

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Jacob H. Stillman, Solicitor; John W. Avery, Deputy Solicitor; Catherine A. Broderick, Senior Appellate Counsel, Securities and Exchange Commission, Washington, D.C., for Plaintiff-Appellee.

Before **KELLY**, **MURPHY**, and **MATHESON**, Circuit Judges.

**MURPHY**, Circuit Judge.

In this civil enforcement action brought by the Securities and Exchange Commission (SEC) against Brian J. Smart and Smart Assets, LLC, the district court entered a $4,715,580 judgment against the defendants for operating a Ponzi scheme,[1] and it permanently enjoined them from further violations of the federal securities laws. Smart appeals pro se. We have jurisdiction under 28 U.S.C. § 1291, and we AFFIRM.

## BACKGROUND

In February 2009, the SEC began investigating Smart, who was the sole owner of Smart Assets, for securities fraud. Smart appeared before the agency in

---

[1]     A Ponzi scheme is a fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of new funds.

*Mosier v. Callister, Nebeker & McCullough*, 546 F.3d 1271, 1273 n.2 (10th Cir. 2008) (brackets and quotation omitted).

-2-

March 2009 to provide testimony, but his counsel instructed him "to take the Fifth Amendment,"[2] and the proceeding ended. R., Vol. 4 at 616.

The next day, the SEC sued Smart and Smart Assets, claiming Smart had defrauded multiple investors because he had represented that investors' money would be placed in low-risk financial instruments, but he then used their money to cover his and his wife's personal expenses, pay prior investors, and engage in high-risk ventures, like hard-money lending. In the process, he commingled investor funds, fabricated account statements, refused investors' inquiries about their money, misled investors about his affiliation with a financial-planning firm, gave promissory notes as collateral for investment funds, and gave investors bogus financial product-information sheets. The SEC asserted that Smart's conduct violated Section 17(a) of the Securities Act of 1933,[3] Section 10(b) of the

---

[2]     The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend V.

[3]     Section 17(a) makes it

    unlawful for any person in the offer or sale of any securities . . .
    directly or indirectly

    (1) to employ any device, scheme, or artifice to defraud, or

    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (3) to engage in any transaction, practice, or course of business

(continued...)

Securities Exchange Act of 1934,[4] and Rule 10b–5.[5] Smart answered pro se, while Smart Assets filed a counseled answer.

---

[3](...continued)
> which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

[4] Similarly, Section 10(b) of the Securities Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, . . .

> To use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[5] Rule 10b-5, promulgated under authority of the Securities Exchange Act, provides:

> It shall be unlawful for any person, directly or indirectly, . . .

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

During discovery, the SEC scheduled Smart's deposition for June 3, 2009. Smart failed to appear. But he did appear the next day for the deposition of Smart Assets. According to Smart, he "was very confused as to why two depositions would be warranted." R., Vol. 5 at 102. After conferring with counsel for Smart Assets, Smart invoked the Fifth Amendment in response to the SEC's questions. Several days later, the SEC offered to reschedule Smart's deposition, but he did not respond.

In August 2009, the SEC moved for summary judgment and asked the district court to draw an adverse inference against Smart in regard to his Fifth Amendment invocations. Smart sought a continuance. Unsuccessful, he retained counsel, who, in February 2010, moved to strike the summary judgment declarations submitted by the investors and counsel for the SEC; moved for summary judgment against the SEC; and moved to withdraw Smart's assertion of the Fifth Amendment. In support of his own summary judgment motion, Smart provided a declaration, attacking the investors' declaration statements and asserting that when he invoked the Fifth Amendment at deposition, he had no idea what the ramifications were.

The SEC opposed Smart's request to withdraw the privilege, and it moved to strike Smart's declaration, arguing that "Smart's improper dilatory tactics ha[d] unjustly prejudiced the Commission" because "it did not have the opportunity to rebut Mr. Smart's newly presented case." *Id.*, Vol. 3 at 232. The SEC also

submitted supplemental investor declarations, which were met by a motion to strike and another declaration from Smart. Finally, the SEC moved to strike Smart's latest declaration.

The district court conducted a hearing, denied Smart's motions, and granted the SEC's motions. In granting summary judgment, the court cited Smart's failure to raise a genuine issue of fact, and it inferred from his Fifth Amendment invocation that "he knowingly and purposely defrauded investors." *Id.*, Vol. 5 at 311. The court then entered judgment for the SEC, finding that Smart was liable for disgorgement of $2,059,077 in investor funds, a civil penalty in that same amount, and $597,426 in prejudgment interest, for a total judgment of $4,715,580.

## DISCUSSION

### I. Withdrawal of Fifth Amendment Privilege

Smart contends that he should have been permitted to withdraw his assertion of the Fifth Amendment and have his declarations considered in opposing summary judgment. We disagree.

The Fifth Amendment allows an individual to not "answer official questions put to him in any . . . proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). But "to prevent a party from converting the Fifth Amendment privilege from its intended use as a shield against compulsory self-incrimination into an offensive sword," "a district court

-6-

may strike conclusory testimony if the witness asserts the Fifth Amendment privilege to avoid answering relevant questions, yet freely responds to questions that are advantageous to his cause." *United States v. $148,840 in U.S. Currency*, 521 F.3d 1268, 1277 (10th Cir. 2008). "A district court's order denying a party's withdrawal of a previously asserted Fifth Amendment privilege in a civil case is reviewed for abuse of discretion." *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 546 (5th Cir. 2012). Similarly, we review the district court's decision to strike Smart's declarations for abuse of discretion. *See Lighton v. Univ. of Utah*, 209 F.3d 1213, 1227 (10th Cir. 2000).

We have not yet defined the parameters in a civil case for withdrawing an invocation of the Fifth Amendment privilege against self-incrimination. Other Circuits have, however, and the Fifth Circuit in particular has recently provided a useful distillation of the analysis. *See Davis-Lynch, Inc.*, 667 F.3d at 546-48.

Withdrawal "is dependent on the particular facts and circumstances of each case." *Id.* at 546.

> Generally, "[t]he court should be especially inclined to permit withdrawal of the privilege if there are no grounds for believing that opposing parties suffered undue prejudice from the litigant's later-regretted decision to invoke the Fifth Amendment." Conversely, withdrawal is not permitted if the litigant is trying to "abuse, manipulate or gain an unfair strategic advantage over opposing parties."

*Id.* at 547 (footnote omitted) (quoting *United States v. Certain Real Prop.*, 55 F.3d 78, 84 (2d Cir. 1995)). An example of impermissible withdrawal is

"when [a party] invoked the privilege throughout discovery and then sought to withdraw the privilege either to support or defend against a motion for summary judgment." *Id.* (collecting cases). Under those circumstances, the opposing party is often placed "at a significant disadvantage because of increased costs, delays, and the need for a new investigation." *Id.* at 548. On the other hand, factors that favor permitting withdrawal include the pro se status of the party who asserted the privilege and now seeks its withdrawal, coupled with a lack of awareness of the consequences of taking the Fifth, and possession by the opposing party of sufficient substitute evidence from the invoking party. *See id.* (citing *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 193-94 (3d Cir. 1994)).

The circumstances of Smart's invocation of the Fifth Amendment reveal that he was using the privilege to manipulate the litigation process. When Smart invoked the Fifth Amendment during discovery, he had failed to attend his own deposition the prior day, and he offered no satisfactory explanation for the failure. And when the SEC offered to reschedule, Smart did not respond.

Further, Smart took the Fifth during the deposition of Smart Assets after conferring with the company's counsel. Even if we assume that Smart was unaware of the potential consequences for invoking the Fifth Amendment at that time, Smart had taken the Fifth on the advice of his own counsel three months earlier, during the SEC's investigatory process. Thus, there was ample time for him to become aware of the consequences of re-asserting the Fifth Amendment

-8-

during the litigation.  Moreover, Smart did not attempt to withdraw his assertion of the Fifth Amendment until after the SEC had moved for summary judgment and the discovery cut-off date had expired.

Given the circumstances of this case, we conclude that the district court did not abuse its discretion in denying Smart leave to withdraw his assertion of the Fifth Amendment privilege against self-incrimination and in striking his declarations.

## II.  Motion to Strike the SEC's Counsel's Declaration

Smart argues that summary judgment was inappropriate insofar as it was based on the declaration of the SEC's counsel.  Smart contends that the declaration, which summarized the evidence in the case, including investor affidavits and bank records, was not based on counsel's personal knowledge.  We review for an abuse of discretion the district court's order denying Smart's motion to strike.  *See Lighton*, 209 F.3d at 1227.

Under Fed. R. Civ. P. 56(c)(4), affidavits supporting or opposing motions for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Even if the district court should have stricken the affidavit, we conclude that any error was harmless given that the investor affidavits and bank records were attached to counsel's affidavit, and investors later provided supplemental affidavits.  *See* Fed. R. Civ. P. 61 ("Unless

-9-

justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.").[6]

### III. Summary Judgment

### A. Standards of Review

We review the district court's summary judgment order de novo, and apply the same legal standards as the district court. *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In conducting the analysis, we "view[ ] all facts [and evidence] in the light most favorable to the party opposing summary judgment." *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

---

[6] Smart summarily contends that "[t]he supplemental declarations of the investors are inadmissible to the extent that they are inconsistent with the declarants' prior declarations." Aplt. Br. at 8. But Smart does not identify any purported inconsistencies, and "[a] witness' affidavit will not be automatically excluded because it conflicts with the witness' earlier or later [testimony]." *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1282 (10th Cir. 2003) (quotation omitted). Instead, "[w]e will disregard a contrary affidavit . . . when it constitutes an attempt to create a sham fact issue." *Id.* (quotation omitted). Smart has not demonstrated any sham fact issues.

## B.  Securities Fraud:  § 17(a), § 10(b), & Rule 10b–5

To establish a § 10(b) or Rule 10b-5 violation,[7] the SEC must prove that Smart made:  (1) "a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by [means of interstate commerce]."  *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008).  Section 17(a)(1)-(3) requires substantially similar proof with respect to the offer or sale of securities.  *Id.*  The primary "difference between § 17(a) and § 10(b) lies in the element of scienter."  *Id.*  Section 10(b) and § 17(a)(1) require the SEC to establish at least recklessness, whereas negligence is sufficient for § 17(a)(2) and § 17(a)(3).  *See id.* at 1256–57; *C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1435 (10th Cir. 1988).  Fundamentally, both § 17(a) and § 10(b) are designed to protect "investors from fraudulent practices."  *Wolfson*, 539 F.3d at 1257 (quotation omitted).

Smart argues that the SEC failed to present admissible evidence of § 17(a) or § 10(b) violations.  We need not dwell extensively on this argument.  The investor declarations and other evidence in the record amply show that Smart misrepresented or omitted material facts in connection with the offer, sale, or purchase of securities, and that he did so with the requisite scienter.  Specifically,

---

[7]     Rule 10b–5 was promulgated by the SEC and "is coextensive with the coverage of § 10(b)."  *SEC v. Wolfson*, 539 F.3d 1249, 1256 & n.11 (quotation omitted).  Thus, we use "§ 10(b)" throughout the remainder of this order and judgment to refer to both the statute and the rule.

Smart told investors that their money would be placed in secure investment vehicles like mutual funds, but he then pooled the money into one account and used it to engage in risky financial ventures, make partial payments to other investors, and cover his and his wife's personal expenses. Smart also ignored investors' inquiries about the status of their funds and provided false accountings. These circumstances go beyond mere recklessness and indicate a deliberate intent to defraud investors. *Cf. C.E. Carlson Inc.*, 859 F.2d at 1435 (stating that recklessness includes conduct that "carries a danger of misleading [investors] such that [the defendant] knew or must have known of its propensity to mislead"). Further, it would be material to a reasonable investor that his or her money was not being used as represented in safe investment strategies, but rather, in high risk ventures and for the payment of personal expenses. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) ("[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." (quotations omitted)).

Contrary to Smart's argument, his activities did involve the offer, sale, or purchase of securities. A violation of the securities laws can occur when the requisite misrepresentation or omission is made "directly or indirectly" "in the offer . . . of any securities," 15 U.S.C. § 77q(a), as well as "in connection with the

purchase or sale of any security," 15 U.S.C. § 78j(b). The "in connection with" requirement is broadly interpreted to cover any fraud that "coincide[s] with a securities transaction." *Wolfson*, 539 F.3d at 1262 (quotations omitted). Indeed, we have held "that misrepresentations made to induce a party to purchase a security *or to influence an investment decision* are made 'in connection with the purchase or sale of a security.'" *Id.* (emphasis added).

Here, Smart took investors' money under the pretense that it would be invested in safe securities, like mutual funds. The fact that he failed to actually buy or sell securities is not dispositive. *See, e.g.*, *SEC v. George*, 426 F.3d 786, 788-89 (6th Cir. 2005) (concluding that defendants committed securities fraud by telling potential investors that their funds would be invested in certain types of securities, but then commingling the funds and using them "to pay purported profits to other investors or to make extravagant personal purchases"). Further, Smart gave investors promissory notes to finance investments. Under these circumstances, the notes constitute securities. *See Reves v. Ernst & Young*, 494 U.S. 56, 66-69 (1990) (stating that a note's presumed status as a security is confirmed when the parties are motivated by an investment purpose, the instrument is sold to a broad segment of the public, a reasonable investor would consider the note to be an investment, and alternate regulatory schemes are inadequate to protect the lender). Thus, Smart was involved in the offer, sale, or purchase of securities.

Smart has not cited any evidence that would contradict the declarations, bank records, and other evidence submitted by the SEC. Although the district court struck Smart's own declarations, Smart proffered no other evidence opposing summary judgment. A properly submitted summary judgment motion cannot be defeated by "mere allegation[s] or denials." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also* Fed. R. Civ. P. 56(e). Rather, "[t]o withstand summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *L&M Enters. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) (quotations omitted). Smart has failed to do so.[8]

---

[8] Because Smart has not met his summary judgment burden, we need not decide whether the district court properly went one step further and drew an adverse inference against him based on his invocation of the Fifth Amendment. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (indicating that a court may draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *cf. Stichting Ter Behartiging Van de Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) ("Even assuming that a *jury* might draw [an adverse inference from asserting the privilege against self-incrimination], however, *we* are required at summary judgment to draw all reasonable inferences in favor of the non-moving party[.]"); *SEC v. Colello*, 139 F.3d 674, 677-78 (9th Cir. 1998) (holding that district court did not err in drawing an adverse inference against defendant based on his Fifth Amendment invocation in a summary judgment proceeding because there was "additional evidence" to support the SEC's case).

## CONCLUSION

The judgment of the district court is AFFIRMED.

Entered for the Court


Michael R. Murphy
Circuit Judge