**SECURITIES and EXCHANGE COMMISSION, Plaintiff,**

v.

**Joseph J. MONTEROSSO, et al., Defendants.**

**Case No. 07–61693–CIV.**

United States District Court, S.D. Florida.

March 31, 2011.

Brent Mitchell, Cheryl J. Scarboro, Jeffery T. Infelise, Reid A. Muoio, Securities

**1248**

& Exchange Commission, Washington, DC, for Plaintiff.

Mark David Hunter, Tiffany Jeanette Brown, Leser Hunter Taubman & Taubman PLLC, Clark D. Mervis, Clark Mervis Law Offices, Miami, FL, Dorothy Patricia Wallace, Walter John Mathews, Walter J. Mathews PA, Fort Lauderdale, FL, Marc Rowin, Lynch Rowin LLP, New York, NY, for Defendants.

*ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT MONTEROSSO (D.E. 312), GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT VARGAS (D.E. 335), AND DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (D.E. 341)*

JOAN A. LENARD, District Judge.

**THIS CAUSE** is before the Court on cross-motions for summary judgment.

On April 26, 2010, Plaintiff Securities and Exchange Commission ("SEC") filed its Motion for Summary Judgment against Defendant Joseph J. Monterosso ("Monterosso").[1] (*See* D.E. 312.) On May 3, 2010, the SEC filed its Motion for Summary Judgment against Defendant Luis Vargas ("Vargas").[2] (*See* D.E. 335.) Finally, on May 4, 2010, Defendants Monterosso and Vargas filed their own Motion for Partial Summary Judgment.[3] (*See* D.E. 341.) Having considered the SEC's motions for summary judgment and Defendants' motion for summary judgment, as well as the responses, replies, related pleadings, and the record, the Court finds as follows.

## I. Background[4]

This is a securities fraud case involving allegations of a fraudulent scheme to generate fictitious revenue for a telecommunications company between 2004 and 2006. In the summer of 2004, GlobeTel, a telecommunications company based in Florida,

1. Monterosso filed his response in opposition on May 24, 2010, to which the SEC filed its reply on June 10, 2010. (*See* D.E. 367, 389.) The SEC filed its Statement of Material Facts on April 26, 2010, and a corrected statement of facts on June 10, 2010. (D.E. 313–1, 390–1.) The SEC's corrected statement of facts merely corrects some of the citations to record evidence. Monterosso filed his Statement of Material Facts on May 24, 2010. (*See* D.E. 365.)

2. Vargas filed his response in opposition on May 27, 2010, to which the SEC filed its reply on June 14, 2010. (*See* D.E. 377, 395.) The SEC filed its Statement of Material Facts on May 3, 2010, and a corrected statement of facts on June 14, 2010. (*See* D.E. 336–1, 396–1.) The SEC's corrected statement of facts merely corrects some of the citations to record evidence. Vargas filed his Statement of Material Facts on May 27, 2010. (*See* D.E. 378.)

3. Defendant GlobeTel Communications Corp. ("GlobeTel") initially joined in this motion. However, on December 22, 2010, pursuant to the agreement of the Parties, the Court entered final judgment against GlobeTel and thus the motion is moot as to this Defendant. The SEC filed its response in opposition on May 27, 2010, to which Defendants filed their reply on June 11, 2010. (*See* D.E. 376, 394.) Defendants filed their Statement of Material Facts on May 4, 2010. (*See* D.E. 344.) The SEC filed its Statement of Material Facts on May 27, 2010. (*See* D.E. 376–1.)

The SEC additionally filed a Notice of Supplemental Authority on September 21, 2010, attaching the decision issued in *SEC v. Mozilo*, Case No. 09–3994–JFW, 2010 WL 3656068 (C.D.Cal. Sept. 16, 2010), with regard to the issue of whether movement of a company's stock price is relevant to the element of materiality. (*See* D.E. 463.)

4. The following facts are undisputed unless otherwise noted.

hired Monterosso to manage its wholesale telecommunications business.[5] Wholesale telecommunications companies generate revenue by connecting those who wish to make telephone calls with companies whose networks have access to those locations the customer wishes to call. Using "switches," either computer arrays or cable connections, wholesale telecom companies can pay by the minute for the right to connect telephone calls to other networks and sell that "termination" service to their customers. For example, a call that originates on a local telephone company's network may eventually pass through switches owned by other companies in order to access a network in a different location which possesses the physical access to the user at the other end of the phone call. Call detail records ("CDRs") record various information pertaining to the traffic at a given switch and are critical to billing and other processes. Between 2004 and 2006, GlobeTel filed various periodic reports describing its wholesale telecom business as buying and selling "large blocks of calling minutes with particular origination and termination points."

At the time of Monterosso's hiring, Timothy Huff ("Huff") was GlobeTel's chief executive officer ("CEO"), Thomas Jimenez ("Jimenez") was GlobeTel's chief financial officer ("CFO"), and beginning in August 2004, Larry Lynch ("Lynch") was GlobeTel's chief operating officer ("COO"). Monterosso ran GlobeTel's telecom business from June 2004 through September 2006, served as president of GlobeTel's subsidiary Centerline Communications until July 2006, and would later serve as GlobeTel's COO from July 2006 to May 2007. Monterosso reported directly to

GlobeTel's CEO. Vargas helped Monterosso run GlobeTel's telecom business in part through his ownership of another telecom company, Carrier Services Inc. ("CSI").

## A. Joint Venture Agreement

In June 2004, Huff and Monterosso negotiated a joint venture agreement between GlobeTel and Vargas's company CSI. The joint venture agreement called for CSI to generate a certain amount of revenue for GlobeTel's wholly-owned subsidiary, Centerline Communications ("Centerline"), in exchange for shares of GlobeTel stock. The parties subsequently renegotiated the joint venture agreement such that CSI would receive 5 million shares of GlobeTel stock if it was able to generate $25 million in revenue for Centerline. Under the agreement, neither CSI nor Monterosso received any payment unless Centerline generated $25 million in revenue. As a result of the joint venture agreement, Monterosso ran GlobeTel's wholesale telecom business, negotiating agreements on behalf of GlobeTel, Centerline, and two other wholly-owned subsidiaries of GlobeTel named Volta Communications ("Volta") and Lonestar Communications ("Lonestar"). Monterosso entered into these agreements with GlobeTel's knowledge and authorization.

## B. "Off–Net" Revenue Program

In an effort to fulfill their end of the joint venture agreement, Monterosso and Vargas explored ways of generating revenue using CSI's switches in California. CSI entered into several Partnership Incentive Financing Agreements ("PIFAs") with third parties. As of January 2005, Monterosso agrees that only three PIFA companies were using Centerline's switch. The SEC contends Monterosso tried to

**5.** GlobeTel's common stock traded over the Over–The–Counter Bulletin Board from 2002 until May 2005 and traded on the American Stock Exchange from May 2005 until October 11, 2006. GlobeTel's common stock was registered pursuant to Section 12 of the Exchange Act.

create revenue for GlobeTel through these smaller deals but that these agreements were eventually terminated within a few months. As a result, in late 2004, Monterosso and Vargas participated in an "off-net" program designed to allow GlobeTel to use CSI's revenue. The term "off-net" refers to telecom traffic run on a switch not owned or operated by GlobeTel, Volta, Lonestar, or Centerline. Nor was any of the "off-net" traffic eventually reported to GlobeTel run on switches belonging to either Centerline or CSI.[6] The SEC contends Monterosso and Vargas initiated the "off-net" program after Jimenez asked them if GlobeTel could use CSI's revenue. Defendants contend the origination of the "off-net" program is more complicated. In essence, Monterosso attended a meeting in Florida in 2004 with Jimenez and Lynch where Jimenez directed Monterosso to procure revenue either through GlobeTel's switches or other companies' switches. Upon returning to California, Monterosso informed Vargas of the plan and relayed that GlobeTel had engaged in similar activity in the past and that GlobeTel's board of directors had approved it. Regardless, Monterosso had not previously been involved with any similar "off-net" traffic during his experience in the telecom industry.

The "off-net" program operated in the following manner. Each quarter, a GlobeTel executive would tell Monterosso the amount of revenue GlobeTel wanted for that quarter. As it turned out, Lynch and other GlobeTel executives constantly demanded more revenue from Monterosso. In order to provide this revenue, Monterosso and Vargas supplied GlobeTel with invoices and CDRs ostensibly relating to the "off-net" traffic. They obtained these invoices and CDRs from other companies. These invoices and CDRs were to represent revenue supposedly generated by GlobeTel's subsidiaries Volta, Lonestar, and Centerline.

### 1. Volta

With regard to Volta, Monterosso obtained some of the invoices from a businessman named Ronald Hay ("Hay") and his company Mercury Telecom ("Mercury"), which sometimes also used the name World Communications Carrier Services ("WCCS").[7] During the relevant time period, Mercury was engaged in wholesale telecom business and owned its own telecom switch. (*See* Hay Depo., D.E. 314–4 at 23–24.) Hay testified that Mercury/WCCS never did any business with Volta, including the purchase or sale of any telecom minutes. (*Id.* at 26–27.) Sometime in 2004, Hay provided Monterosso

---

**6.** According to Monterosso, he allowed CSI to use the switches that he owned. (*See* Monterosso Depo., D.E. 365–1 at 10.) These switches consisted of model TDM Nortel 250 switches and related Cisco VOIP equipment located in California. (*Id.*) Monterosso testified that he received compensation from CSI in return for use of the switches. (*Id.*) In approximately February 2005, Centerline purchased the switches pursuant to two asset purchase agreements. (*Id.* at 15–16.) Although Monterosso's testimony is somewhat contradictory, it appears that for a period in late 2004 and early 2005, which corresponded with GlobeTel's purchase of the switch equipment, the switch may have been inoperable for a period of six months, and the VOIP

equipment for at least 30 to 45 days, as the equipment was moved from the 1 Wilshire building to a location at 111 Wilshire in Los Angeles, California. (*Id.* at 24.) The majority of international carriers operating in the United States possess facilities connected to the 1 Wilshire building in Los Angeles (where most Pacific Rim carriers are interconnected) and/or the 60 Hudson building in New York (where most of the Atlantic Basin carriers are interconnected). (*See* D.E. 314–12 at 24.)

**7.** The name WCCS was apparently used by Mercury to do business with a Verizon subsidiary named Codetel. (*See* D.E. 365 at ¶ 40; Hay Depo., D.E. 17–23.)

and Vargas with invoices WCCS had sent to its customer Codetel. Hay testified that he never provided any invoices to Monterosso or Vargas after December 2004. (*Id.* at 29.) Monterosso and Vargas admit that "in the on-net context as a partner under a PIFA," Volta was "never operational" and as a subsidiary of Globe-Tel "never had its own customers." (D.E. 365 at ¶ 38; D.E. 378 at ¶ 38.) It is further undisputed that Volta never ran telecom traffic through a Centerline switch. As a matter of fact, Monterosso and Vargas admit that Volta "never bought or sold anything" because it was never operational. Rather, "[i]n connection with the Off-Net Program, it was only a name used to convey costs of goods sold and revenues of real traffic while protecting the identities of those buying and selling the traffic minutes." (*Id.* at ¶ 42.)

Once Vargas received the invoices and/or CDRs from Hay or his employee John Petuoglu ("Petuoglu"), he would then change the name of the customer from "Codetel" to "Volta." (D.E. 336–1 at ¶ 44; D.E. 365 at ¶ 44; D.E. 378 at ¶ 44.) Between September 2004 and December 14, 2004, Vargas changed the customer name on the actual WCCS invoices from Codetel to Volta and submitted the invoices to GlobeTel's accounting department. On December 27, 2004, Monterosso sent an e-mail to Petuoglu, with a copy sent to Vargas, stating he needed additional revenue before the end of the year. (*See* D.E. 314–7 at 4.) The e-mail begins by stating, "[w]e are rapidly approaching the end of the year and I need to add some additional revenue. Can you provide the following from your other customer base?"

The e-mail then details that Monterosso had received a Codetel invoice of $71,775.57 for December 13–19th, but needed an additional $275,000, and he had received an estimated Codetel invoice for $75,000 for December 20–26th, but needed an additional $285,000. Monterosso and Vargas subsequently submitted invoices to GlobeTel's accounting department for December 21st and December 28th. These invoices match the real WCCS invoices except that the customer name was changed to Volta and the amounts were increased to $271,775.57 for the December 21st invoice and $363,457.38 for the December 28th invoice. At the end of 2004, Hay ceased providing Monterosso with invoices from Mercury/WCCS.

Eventually, Monterosso and Vargas started receiving CDRs from a Texas businessman named Chuck Leblo ("Leblo"). Vargas used these CDRs to create invoices for Volta, despite the fact that Leblo had no connection to Hay's company, Mercury/WCCS. In effect, Vargas used the data from the CDRs and created invoices using WCCS's letterhead, such that the invoices appeared to reflect sales of telecom minutes by WCCS to Volta. This despite the fact that Vargas did not work for WCCS and no one at WCCS authorized either Monterosso or Vargas to create or alter WCCS or Mercury invoices. Throughout 2005 and 2006, Vargas continued to create invoices that appeared to reflect Volta was buying and selling telecom minutes from Mercury and WCCS using CDRs provided from Leblo, who had no connection to these companies.[8] The SEC contends Defendants knew the invoices Vargas created

---

**8.** Monterosso and Vargas dispute this fact only to the extent they throw in the caveat, "[t]o anyone not familiar with the Off-Net Program, the Volta invoices may have appeared to represent sales by WCCS to Volta." (D.E. 365 at ¶ 55.) Many of the Defendants'

"disputed" facts do not contest the underlying facts but rather add caveats or language suggesting that knowledge or familiarity with the "Off-Net Program" somehow explains the conduct.

did not represent actual telecom traffic run on anyone's telecom switch. Monterosso contends he understood the invoices to represent actual minutes run on a telecom switch and understood the revenues to always be constrained by the amount of actual traffic run by others. (D.E. 336–1 at ¶ 56; D.E. 313–1 at ¶ 56; D.E. 365 at ¶ 56.)

### 2. Lonestar

GlobeTel also reported "off-net" revenue from another subsidiary named Lonestar. Lonestar purportedly engaged in "off-net" traffic by purchasing minutes from one of Leblo's companies named XSTEL, and selling those minutes to another of Leblo's companies named Telmetriks. Although neither of these companies owned a telecom switch or were engaged in the wholesale telecom business, Monterosso testified that Leblo represented to him on several occasions that Leblo owned a telecom switch. In any event, Monterosso and Vargas contend that Lonestar "was merely a name used on invoices representing traffic run on Leblo's switch during specific quarters." (D.E. 365 at ¶ 57; D.E. 378 at ¶ 57.) It is undisputed that Lonestar never actually sold anything to Telmetriks or bought anything from XSTEL and Lonestar never ran telecom traffic through Centerline's switch.

Nevertheless, in 2004 and early 2005, Monterosso obtained additional invoices and CDRs from Leblo purporting to show Lonestar did business with Telmetriks and XSTEL. Monterosso and Vargas submitted invoices to GlobeTel's accounting department reflecting Lonestar bought minutes from XSTEL and sold minutes to Telmetriks. These invoices also reflected payments from Lonestar to XSTEL. The SEC contends these invoices were sent despite the fact that no services were ever provided and no payments were ever made. Citing only Monterosso's deposi-

tion, Monterosso and Vargas claim that as far as they knew, services and payments were being made. (D.E. 365 at ¶ 61; D.E. 378 at ¶ 61; Monterosso Depo., D.E. 365–1 at 460–61.) Monterosso and Vargas additionally submitted CDRs to GlobeTel to support this "off-net" revenue.

### 3. Centerline

Finally, GlobeTel reported "off-net" revenue from its subsidiary Centerline. Centerline's only purported "off-net" customer and vendor was CSI. Nevertheless, Centerline never bought anything from or sold anything to CSI as part of the "off-net" program. After September 2004, CSI did not run any telecom traffic through Centerline's switch. Between September 2004 and March 2006, Monterosso and Vargas created invoices reflecting sales to and purchases from CSI even though CSI was not running any "off-net" traffic. Defendants contend those familiar with the "off-net" program would have recognized that these invoices reflected traffic running elsewhere on someone else's switch. As with Volta and Lonestar, Vargas used CDRs procured from Leblo in order to create these "off-net" invoices between CSI and Centerline.

### C. Submission of Documents to GlobeTel

At Monterosso's instruction, Vargas submitted all of the invoices he created and all the CDRs he obtained that were related to the "off-net" business of Volta, Lonestar, and Centerline, to GlobeTel's accounting department. Not later than December 2004, Monterosso and Vargas knew all the invoices they forwarded to GlobeTel were being entered in the company's general ledger. GlobeTel recorded revenue and costs of goods expenses from Centerline and its subsidiaries by making entries in

its general ledger.[9] The SEC also contends that between September 2004 and February 2005, Monterosso and Vargas submitted CDRs that were actually just cloned or duplicated and did not represent any actual telecom traffic. Defendants contend they were not aware any CDRs were cloned or duplicated. Nevertheless, Monterosso and Vargas knew GlobeTel's accountants would use the invoices and CDRs provided in connection with their audits of GlobeTel's financial statements. Additionally, both Monterosso and Vargas were aware that GlobeTel's failure to meet its revenue goals would negatively impact the company's stock price. Inasmuch, on June 23, 2005, Vargas sent an e-mail to Leblo requesting additional revenue and stating, "it would really be bad if the revenue goals were not met. Would really negatively impact price." (*See* D.E. 314–27 at 6.)

**D. $1.6 Million Additional Revenue**

At some point in April 2005, Lynch asked Monterosso for an extra $1.6 million in "off-net" revenue for the first quarter of 2005, which ended on March 31, 2005. Based upon Lynch's request, on April 27, 2005, Vargas forwarded an e-mail to Leblo which includes a table identifying the amount of "additional" revenue needed for Volta, Lonestar, and CSI for the previous quarter. (*See* D.E. 314–28 at 74–77.) The totals for the three subsidiaries add up to approximately $1.6 million. (*Id.*) Monterosso claims that upon Lynch's request, he contacted Leblo to see whether he had any additional revenue from the first quarter of 2005 that GlobeTel could utilize. When Leblo responded with CDRs representing

$1.6 million in traffic for that time period, Vargas prepared invoices based upon that traffic "in accordance with the Off–Net Program." (D.E. 365 at ¶ 73.) During April and May 2005, Vargas created $1.6 million in invoices reflecting traffic involving Volta, Lonestar, and Centerline that occurred in March 2005. On May 2, 2005, Vargas informed Leblo that he needed the additional $1.6 million in revenue "ASAP." (D.E. 314–28 at 79.) That same day, GlobeTel made entries in its general ledger recording revenue for Volta, Lonestar, and Centerline totaling approximately $1.6 million. Among other things, these entries violated Generally Accepted Accounting Principles ("GAAP") because they did not represent services performed by those companies during the first quarter of 2005.

**E. GlobeTel's Knowledge of the "Off–Net" Program**

Defendants and the SEC agree that Jimenez understood GlobeTel was recording someone else's revenue as its own at least as far back as October 2004. Others at GlobeTel were also aware of the program. On January 12, 2005, Vargas accidentally sent Lynch an invoice from WCCS to Codetel. (*See* Invoice # 4135, D.E. 313–22 at 32.) Lynch responded the next day with an e-mail to Vargas noting the WCCS Invoice # 4135 was addressed to Codetel, not Volta, and requesting a "new one." (D.E. 314–28 at 23.) Vargas subsequently sent a corrected invoice. Moreover, Lynch always believed the revenue Centerline and its subsidiaries were reporting was "fake." Additionally, Jimenez's understanding of the "off-net" reve-

---

9. GlobeTel used accrual accounting. As such, its accounting policy was to record revenue after it provided a service and sent an invoice to a customer and record cost of goods sold after it had used the vendor's services and received the vendor's invoice. GAAP requires that a company deliver products or render services prior to recording revenue. GlobeTel's periodic reports, filed electronically with the SEC, were created from its financial books and records, including the revenue and cost of goods sold entries in its general ledger. (*See* D.E. 313–1 at ¶¶ 15–21.)

nue program was further crystallized through several subsequent e-mails.[10] It was Lynch and Jimenez who were responsible for the recording of the "off-net" revenue by GlobeTel.

In turn, GlobeTel's auditors believed Volta and Lonestar provided "traffic or the sale of minutes" as part of the "off-net" program and that Volta and Lonestar had their own customers and vendors. Vargas does not dispute that no one ever told GlobeTel's auditors that the "off-net" revenue involved someone else's customers, switches, and vendors. Monterosso contends GlobeTel's auditors understood and were aware of the "off-net" program. There is no dispute that no one ever told GlobeTel's auditors that Leblo created CDRs for Volta, Lonestar, and Centerline, and that information would have affected their audit such that the auditors would have advised GlobeTel to "wipe out" that revenue. Also, no one told GlobeTel's auditors that Vargas had created invoices on behalf of Volta's or Lonestar's vendors but that those invoices had never been sent to the vendors. Additionally, no one told GlobeTel's auditors about the effort to add $1.6 million in revenue after the end of the first quarter for 2005.

### F. GlobeTel's False Statements

As a result of the "off-net" program, GlobeTel issued several false statements in its annual reports for the years 2004 and 2005, as well as quarterly reports dated March 31, 2005, March 31, 2006, May 12, 2006, and June 9, 2006 (two reports).

For the year 2004, GlobeTel reported $28,996,213, of total revenue. Of this amount, approximately 58% or $16,825,522, was attributed to "off-net" revenue generated by Centerline ($5,862,146), Lonestar ($8,135,626), and Volta ($2,827,750). For the year 2005, GlobeTel reported $81,143,838, of total revenue. Of this amount, approximately 87.4% or $70,916,586, was attributed to "off-net" revenue generated by Centerline ($22,216,-440), Lonestar ($31,316,558), and Volta ($17,383,588). Finally, for the first quarter of 2006, GlobeTel reported $22,294,725, of total revenue. Of this amount, approximately 92% or $20,502,876, was attributed to "off-net" revenue generated by Centerline ($6,977,754), Lonestar ($8,231,255), and Volta ($5,293,867). The SEC states that 81.7% or approximately $108 million of GlobeTel's reported revenue during this period was fake "off-net" revenue.

Additionally, the following registration statements incorporated by reference at least one of the annual reports and were signed by Huff and Jimenez: Forms S–3 filed on June 23, 2005, December 5, 2005, and Forms S–8 filed on August 31, 2005, January 4, 2005, and August 4, 2006. These registration statements registered the offering or sale of approximately 13.7 million shares of GlobeTel stock.

GlobeTel also issued at least five different press releases which emphasized or discussed its revenue numbers and projections. On October 13, 2004, GlobeTel issued a press release announcing that revenue had been exceeding $900,000 per week and that the company expected traffic to average $4–5 million per month in the fourth quarter of 2004. (See D.E. 390 at ¶ 97; D.E. 314–33.) On March 31, 2005, GlobeTel issued a press release reporting $28,996,213 in revenue for 2004 and quoted Huff as stating, "[w]e cannot be more excited about the Company and its future

---

**10.** On July 13, 2005, Monterosso sent an e-mail to Jimenez stating, "I am paying for the use of the customers and CDRs," and Jimenez understood this to mean he was paying vendors for the use of their customers and CDRs and "that it wasn't real." (D.E. 314–33 at 6–7.)

than we are this very moment. We wanted to grow our revenue base in 2004 and we did just that." (*See id.* at ¶ 98; D.E. 314–33.) On May 14, 2005, GlobeTel issued a press release quoting Huff as saying he was pleased with GlobeTel's business growth and revenues were up. (*See id.* at ¶ 99; D.E. 314–33.) On September 23, 2005, GlobeTel issued a press release announcing that it "expects to achieve record revenue of approximately $22 million for the third quarter ending September 30, 2005." (*See id.* at ¶ 100; D.E. 314–33.) On May 12, 2006, GlobeTel issued a press release announcing that GlobeTel had "achieved revenue of $22,294,725, or 24% more than revenue of $18,010,643 reported for first quarter 2005 and a 5.5% sequential rise over fourth quarter 2005 revenue of $21,133,147." (*See id.* at ¶ 101; D.E. 314–33.)

### G. Procedural History

After several years of investigation, the SEC filed its initial complaint in this matter on November 21, 2007. (*See* D.E. 1.) That complaint alleged violations of the securities laws against Monterosso and Vargas. On May 1, 2008, the SEC filed another complaint against Defendants GlobeTel, Huff, Jimenez, and Lynch in Case No. 08–60647–CIV. The May 2008 Complaint presents some of the same allegations as contained in the November 2007 Complaint and alleges Jimenez's and Lynch's role in the alleged fraud.[11] In

May 2008, Lynch and Huff settled with the SEC and consented to judgment.[12] That complaint was subsequently consolidated with this case on November 12, 2008. (*See* D.E. 62.) On September 8, 2009, the Commission filed another action against Huff in Case No. 09–61419–CIV. That case was eventually transferred to the undersigned and consolidated with the instant action on September 21, 2009.[13] The Court subsequently ordered the SEC to file one operative complaint incorporating all of its allegations against all of the defendants.

On June 5, 2009, the SEC filed its Second Amended Combined Complaint ("Combined Complaint," D.E. 142–1). The Combined Complaint sets forth the following claims with regard to Monterosso and Vargas: (1) violations of Section 17(a) of the Securities Act (" § 17(a)"), which prohibits fraud in the offer or sale of securities; (2) Violations of Section 10(b) of the Securities Exchange Act (" § 10(b)") and Rule 10b–5, which prohibit fraudulent acts and material misstatements or omissions in connection with the purchase or sale of any security; (3) Aiding or Abetting Violations of Section 10(b) and Rule 10b–5; (4) Aiding or Abetting Violations of Section 13(a) of the Securities Exchange Act and Rules 12b–20, 13a–1, and 13a–13, which in part prohibit filing reports with the SEC that contain false statements of material fact, and failing to correct misleading or omitted information; (5) Aiding or Abet-

---

**11.** On March 19, 2010, the Court entered judgment against Jimenez upon his consent. (*See* D.E. 269, 274.) On December 18, 2010, the Court entered judgment against GlobeTel upon its consent. (*See* D.E. 466, 467.) The Court modified the judgment against GlobeTel on February 22, 2011. (*See* D.E. 468, 469.)

**12.** Judge Martinez entered judgment against Huff on May 15, 2008, and judgment against Lynch on March 16, 2008, in Case No. 08–60647–CIV. (*See* D.E. 6,7.)

**13.** The Court originally stayed this action against Huff pending the outcome of Huff's parallel criminal proceedings in *United States v. Huff,* Case No. 09–60295–CRMiddlebrooks. (*See* D.E. 244.) Huff ultimately pled guilty and was sentenced in that case, thus resulting in the stay being lifted. On September 7, 2010, the Court entered judgment against Huff upon his consent. (*See* D.E. 435, 437.)

ting Violations of Section 13(b)(2)(A) of the Securities Exchange Act, which in part requires every issuer to make and keep records which in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (6) Violation of Securities Exchange Act Rule 13b2–1, which prohibits any person from falsifying or causing to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act, and violation of Rule 13b2–2, which in part prohibits a director or officer from making or causing to be made a materially false or misleading statement or omission to an accountant in connection with documents or reports required to be filed with the SEC. (Combined Complaint at ¶¶ 97–125.) The SEC seeks various types of injunctive and equitable relief, as well as disgorgement and civil monetary penalties. The Parties have now filed cross-motions for summary judgment.

## II. Motions for Summary Judgment
### A. Monterosso

The SEC seeks summary judgment on all of its claims against Monterosso. First, the SEC claims Monterosso is liable for primary violations of the anti-fraud provisions based on his conduct in making false statements and participation in a fraudulent scheme. The SEC contends Monterosso's submission of false invoices and CDRs that he knew would be recorded in GlobeTel's books constitute false statements. The SEC also contends that Monterosso played a central and essential role in the scheme to create fake revenue for GlobeTel under the guise of the "off-net" program. According to the SEC, the "off-net" program was a fraudulent scheme prohibited by Rule 10b–5(a) and (c). Next, the SEC argues the evidence in the record demonstrates Monterosso acted with knowledge or at least acted recklessly in manufacturing and submitting invoices for

business that never occurred. The SEC argues Monterosso could not have believed it was proper to report revenue that involved: (1) manufacturing invoices using other companies' letterhead but changing the names of customers or vendors · and altering the amounts; (2) never sending invoices, receiving payment from, or making payment to the purported "off-net" customers or vendors of Volta and Lonestar; (3) reverse-engineering "off-net" revenue from the revenue figures that Globe-Tel executives demanded; (4) using fake CDRs unrelated to purported "off-net" traffic; (5) adding $1.6 million in additional "off-net" revenue to a previous fiscal quarter after the quarter had ended; and (6) reporting revenue for Volta, Lonestar, or Centerline when they did not provide any telecom service or sell or buy anything. (D.E. 313 at 23.) Thus, the SEC believes the undisputed facts demonstrate knowledge or at least severe recklessness. Additionally, the SEC argues GlobeTel's overstatements of revenue of approximately $108 million, constituting 58 percent of GlobeTel's total revenue in 2004, 87.4 percent of GlobeTel's total revenue in 2005, and 92 percent of GlobeTel's total revenue for the first quarter of 2006, were clearly material. The SEC submits the materiality of GlobeTel's revenue assessments is evidenced by its emphasis in press releases and GlobeTel's later restatement of its annual financial statements for 2004 and 2005. These statements were also "in connection with" the purchase or sale of a security given the misstatements were contained in numerous 10–Ks and 10–Qs filed with the SEC which were also incorporated in five registration statements registering approximately 13.6 million shares of stock. (See D.E. 313 at 27.) Second, the SEC contends Monterosso is liable for aiding and abetting GlobeTel's violations of the anti-fraud provisions given

his role in the "off-net" revenue scheme. Third, the SEC argues Monterosso aided GlobeTel's reporting and books and records violations. Finally, the SEC contends Monterosso falsified records and misled GlobeTel's auditors in violation of Rules 13b2–1 and 13b2–2. As a result, the SEC seeks a permanent injunction against Monterosso, disgorgement in the amount of $665,000, and the imposition of civil penalties.

In response, Monterosso asserts that any revenue misstatements were immaterial given that any "so-called 'fictitious' revenue was accompanied by equal amounts of 'fictitious' expenses," and Monterosso's participation was procured by GlobeTel officers who created the program, approved the program, and advised Monterosso it was authorized. Monterosso initially incorporates by reference the arguments raised in Defendants' motion for summary judgment on the issue of materiality. Monterosso argues any statements regarding revenue were immaterial because they corresponded with either a decrease or no change to GlobeTel's stock price. With regard to scienter, Monterosso contends he had no intent to deceive, manipulate, or defraud. Instead, he claims Jimenez advised him at the outset of the "off-net" program that GlobeTel wanted to obtain revenue through purchase from other wholesale carriers, that GlobeTel had done this in the past, and that the practice was approved by Globe-Tel's accountants and auditors. Upon learning the program "may have had some problems," Monterosso and Vargas refused to provide additional invoices or CDRs to GlobeTel. (*See* D.E. 367 at 11.) Monterosso generally asserts that both materiality and scienter are fact-specific inquiries requiring adjudication by the jury. Furthermore, Monterosso argues the SEC cannot demonstrate causation sufficient for Monterosso to be held pri-

marily liable for violations of the anti-fraud provisions. Nor can the SEC demonstrate Monterosso aided or abetted any fraud, reporting, or books and records violations by GlobeTel. Finally, Monterosso argues none of the proposed remedies are appropriate in this case.

In reply, the SEC contends Monterosso fails to cite to admissible evidence in accordance with Rule 56 or Local Rule 7.5(c). The SEC also contends GlobeTel's misstatements were material regardless of any movement in the price of its stock. This is due to the fact that the SEC need not prove reliance or causation as would be necessary in a private securities action. Moreover, the SEC argues the Court need not accept implausible interpretations of the facts such as those offered with regard to Monterosso's knowledge of the purpose of the "off-net" program. Citing to admissions contained in Monterosso's Answer, the SEC states Monterosso has admitted that: (1) neither Telmetriks nor XSTEL owned a telecom switch or engaged in telecom business; (2) Vargas created false invoices at Monterosso's direction; (3) Monterosso and Vargas obtained false CDRs in order to substantiate fictitious revenue; (4) Monterosso and Vargas submitted false invoices and CDRs to Globe-Tel knowing they did not represent business conducted by GlobeTel's subsidiaries; (5) all of the invoices related to Lonestar were false in that Lonestar neither purchased minutes from XSTEL nor sold minutes to Telmetriks; (6) Monterosso provided, or directed Vargas to provide, CDRs to GlobeTel's accountants to substantiate the "off-net" revenue; and (7) GlobeTel's accountants made and reviewed entries in the general ledger based upon the invoices and CDRs provided. (D.E. 389 at 12–13; D.E. 474.) Monterosso also admitted he knew the "off-net" revenue he provided was being used in GlobeTel's public filings.

(D.E. 313–1 at ¶ 68; D.E. 365 at ¶ 68.) Therefore, the SEC argues there are no genuine issues of material fact regarding the issue of scienter. Moreover, the SEC contends Monterosso is primarily liable based upon his role in providing false documents supporting the fraudulent "off-net" scheme despite the fact that he did not personally make general ledger entries or prepare the financial statements for Globe-Tel. In any event, the SEC argues there is sufficient evidence in the record to support liability under an aiding and abetting theory due to Monterosso's substantial assistance in the fraudulent scheme.

### B. Vargas

The SEC also seeks summary judgment on all of its claims against Vargas. In sum, the SEC repeats many of the same arguments as advanced with respect to Monterosso. The SEC contends Vargas is liable for primary violations of the anti-fraud provisions based on his submission of fake invoices and CDRs to GlobeTel's accountants. According to the SEC, each fake document was a false statement about Centerline's operations and no later than December 2004, Vargas knew GlobeTel was entering the fictitious revenue into its general ledger and GlobeTel's accountants were using the CDRs in connection with their audits. The SEC also alleges Vargas is primarily liable because Vargas and his company CSI played a central role in the fraudulent scheme. As with Monterosso, the SEC states that Vargas could not have believed it was proper to report revenue that involved: (1) manufacturing invoices using other companies' letterhead but changing the names of customers or vendors and altering the amounts; (2) never sending invoices, receiving payment from, or making payment to the purported "off-net" customers or vendors of Volta and Lonestar; (3) reverse-engineering "off-net" revenue from the revenue figures that GlobeTel executives demanded; (4) using fake CDRs unrelated to purported "off-net" traffic; (5) adding $1.6 million in additional "off-net" revenue to a previous fiscal quarter after the quarter had ended; and (6) reporting revenue for Volta, Lonestar, or Centerline when they did not provide any telecom service or sell or buy anything. (*See* D.E. 336 at 23.) The SEC suggests that the reporting of "off-net" revenue based on the activities of an unrelated telecom company would be analogous to a company such as Verizon recording revenue "as the result of telecom traffic AT & T ran through its own telecom switch from AT & T's customers to AT & T's vendors." (*Id.* at 23 n. 5.) The SEC further reiterates that the revenue overstatements were material and in connection with the purchase or sale of a security. According to the SEC, Vargas's role in creating fake invoices and CDRs and submitting them to GlobeTel constitutes providing substantial assistance to GlobeTel's violations and is sufficient for liability for aiding and abetting. As a result, the SEC seeks a permanent injunction against Vargas, disgorgement in the amount of $587,000, and the imposition of civil penalties.

In response, Vargas raises many of the same arguments presented by Monterosso. In essence, Vargas asserts that any revenue misstatements were immaterial given that any statements of revenue were reported "just one line above the statement of the costs of the revenues, which either exceeded the revenues or were close in value." (*See* D.E. 377 at 3.) Vargas also notes any that any revenue statements correspond with either a decrease or no change to GlobeTel's stock price. Like Monterosso, Vargas also incorporates by reference the arguments raised in Defendants' motion for summary judgment on the issue of materiality. Vargas further asserts that the Court may not rely upon

GlobeTel's press releases on the issue of materiality as they constitute inadmissible hearsay. Additionally, Vargas contends GlobeTel's restatements of its prior annual reports was due to lack of documentation and accounting errors, and thus is not relevant to the issue of materiality. With regard to scienter, Vargas argues he had nothing to do with GlobeTel's revenue reporting or press releases, and thus did not possess knowledge of any misstatements. Vargas concludes that he lacked the sophistication or knowledge of GAAP to be held accountable and scienter is an issue of fact for the jury to decide in any event. Vargas incorporates many of the arguments raised by Monterosso throughout his response, including those raised as to the aiding and abetting claims. Finally, Vargas argues none of the proposed remedies are appropriate in this case.

In reply, the SEC contends Vargas also fails to cite to admissible evidence in accordance with Rule 56 or Local Rule 7.5(c). The SEC believes that Vargas cannot rely upon his own investigative testimony after he asserted his Fifth Amendment privilege against self-incrimination at his deposition. The SEC argues his investigative testimony would be inadmissible at trial. The SEC also argues that Vargas's response is deficient to the extent that it attempts to incorporate arguments raised by Monterosso and those raised in other pleadings. Such incorporation would also violate the pagination limits provided by the Court. The SEC also reiterates many of its prior arguments with regard to materiality and scienter addressed as part of Monterosso's motion. Thus, the SEC argues the undisputed evidence in the record demonstrates Vargas is liable for both primary and secondary violations of the securities laws.

## C. Defendants' Motion for Partial Summary Judgment

Defendants move for partial summary judgment on the SEC's fraud claims on the basis that any misstatements of revenue were immaterial. Defendants contend this is a revenue recognition case and one that is quite unique because it involves offsetting statements of revenue and costs of good sold that resulted typically in small losses being reported for GlobeTel. Defendants further argue that any overstatements of revenue could not have been material when considered with the company's other disclosures of huge operating losses and problems with the wholesale telecom aspect of the business. Finally, Defendants believe the market's reaction, or lack thereof, to GlobeTel's alleged misstatements demonstrates their lack of materiality.

In response, the SEC argues Defendants' arguments are supported with mostly inadmissible evidence including an affidavit submitted by GlobeTel's counsel.[14] The SEC contends that much of Defendants' argument is based upon the false premise that the SEC must prove investor reliance, causation, or damages in order to prove a violation of § 10(b) or § 17(a). The SEC contends it need not prove any movement of GlobeTel's stock price in order to prove materiality. It also argues the relevant date for determining the impact of the statements would be the date GlobeTel disclosed the fraudulent nature of the "off-net" revenue, which it has yet to do. The SEC further argues the opinions offered by Defendants' expert, Andrew Leone ("Leone"), regarding materiality are

14. On March 8, 2011, the Court granted the SEC's motion to strike the declaration submitted from Maranda E. Fritz. (*See* D.E. 473.) Fritz's declaration was stricken as it was not based on personal knowledge, was unsworn and proffered by counsel of record in this case, and mainly offered argument and citation to other record evidence.

irrelevant and unreliable.[15] Furthermore, the SEC contends the sheer size of Globe-Tel's revenue overstatements indicate their materiality. The SEC also argues that GlobeTel conceded the materiality of its revenue statements when it restated its revenue for the years 2004 and 2005 as part of its amended annual reports. These reports removed the "off-net" transactions and reduced GlobeTel's reported revenue from $28,996,213 to $11,309,376 for the year 2004, and from $81,143,838 to $10,144,789 for the year 2005. (*See* D.E. 376 at 24.) Finally, the SEC argues that its own expert, Stanley Murphy ("Murphy"), opines that GlobeTel's annual statements were materially misstated.

In reply, Defendants reiterate many of their prior arguments and state the SEC cannot establish materiality. Defendants also attempt to distinguish the cases cited by the SEC as involving alleged misstatements of net income and earnings, not offsetting revenue. Moreover, Defendants contend that data[16] showing GlobeTel's stock price confirms the alleged misstatements were immaterial and notes that they have sought to exclude Murphy's opinions based on the reliability of his methodology.[17] Finally, Defendants assert that GlobeTel's restatements contained in the amended filings for 2004 and 2005 do not demonstrate materiality. Thus, Defendants argue they are entitled to summary judgment on the SEC's fraud claims, or Counts I, II, and III of the Combined Complaint.

### III. Standard of Review

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.CIV.P. 56(a). The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is

---

**15.** The SEC filed a motion *in limine* to exclude Leone's testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Rule 702 of the Federal Rules of Evidence. (*See* D.E. 405, 406.) This motion is still pending. Because the Court would reach the same result with or without Leone's opinions, this motion is **DENIED AS MOOT.**

**16.** On March 8, 2011, the Court granted Defendants' motion to take judicial notice of certain information including GlobeTel's daily closing stock price from January 2002 through December 2007, as provided by Defendants. (*See* D.E. 472.)

**17.** Defendants filed a motion *in limine* to exclude Murphy's opinions pursuant to *Daubert* and Rule 702. (*See* D.E. 337, 338.) This motion is still pending. Because the Court would reach the same result with or without Murphy's opinions, this motion is **DENIED AS MOOT.**

not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548; *see also* FED.R.CIV.P. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. 1348. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Id.*

## IV. Discussion
### A. Anti–Fraud Provisions

■ Section 10(b) of the Exchange Act makes it unlawful:

... for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—... (b) To use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The SEC's Rule 10b–5, promulgated thereunder, states that,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. "Section 10(b) was designed to protect investors involved in the purchase and sale of securities by requiring full disclosure." *SEC v. DCI Telecommunications, Inc.,* 122 F.Supp.2d 495, 498 (S.D.N.Y.2000) (citing *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)). The scope of liability is the same under section 10(b) and Rule 10b–5. *See SEC v. Mer-*

*chant Capital, LLC,* 483 F.3d 747, 766 n. 17 (11th Cir.2007); *SEC v. Zandford,* 535 U.S. 813, 816 n. 1, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002).

■ In order to prove a violation under § 10(b), the SEC must show the defendants: (1) employed a device, scheme or artifice to defraud or made materially false statements; (2) in connection with the purchase or sale of securities; (3) using an instrumentality of interstate commerce; and (4) with scienter. *Merchant Capital,* 483 F.3d at 766 (citing *Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)). Section 17(a) "requires substantially similar proof." *SEC v. Wolfson,* 539 F.3d 1249, 1256 (10th Cir.2008) (quoting *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996)).

■ Section 17(a) of the Securities Act provides that it is unlawful for any person, directly or indirectly, in the offer or sale of securities:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). "To show a violation of section 17(a)(1), the SEC must prove (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with scienter." *Merchant Capital,* 483 F.3d at 766 (citing *Aaron,* 446 U.S. at 697, 100 S.Ct. 1945). However, to prove a violation of section 17(a)(2) or (3), "the SEC need only show

(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." *Id.* (citing *Aaron,* 446 U.S. at 702, 100 S.Ct. 1945). "The principal difference between § 17(a) and § 10(b) lies in the element of scienter, which the SEC must establish under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)." *Wolfson,* 539 F.3d at 1257. Unlike private securities enforcement actions, the SEC need not prove reliance or injury under § 17 or § 10(b). *Id.* at 1258 n. 14, 1260 n. 17.

■ There is no dispute that GlobeTel made numerous misstatements concerning its revenue as part of its SEC filings between 2004 and 2006. Neither Monterosso nor Vargas dispute that the entries in GlobeTel's general ledger based upon the "off-net" transactions caused GlobeTel to misstate the revenue it reported in its 2004 and 2005 10–K filings, as well as numerous quarterly reports. (*See* D.E. 390 at ¶ 91.) Nor is it in dispute that GlobeTel filed at least five registration statements incorporating by reference the 2004 or 2005 annual reports and that these statements registered the offering or sale of approximately 13.6 million shares of GlobeTel stock. (*See id.* at ¶ 94.) It is also undisputed that GlobeTel issued several press releases in which it announced its reported revenue and/or projected revenue figures. It is further undisputed that GlobeTel filed amended annual reports for 2004 and 2005 that removed the "off-net" transactions from its reported revenue and that Globe-Tel's "correct" revenue was $11,309,376, for 2004, and $10,144,780, for 2005. (*See id.* at ¶ 102.) Monterosso does not dispute that GlobeTel raised over $10 million from the sale of stock during 2005 and 2006. (*See id.* at ¶ 103.) Because documents such as press releases and annual reports "are designed to reach investors and to influence their decisions to transact in a publicly-traded security," any misrepre-

sentation contained within these documents is generally made "in connection with" the purchase or sale of that security where the statement is material. *See Wolfson,* 539 F.3d at 1262; *see e.g., SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1362 (9th Cir.1993); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 861–62 (2d Cir.1968). As a result, the Court finds there is no genuine issue of material fact as to whether GlobeTel issued misrepresentations or false statements concerning its revenue figures and whether such statements were issued in connection with the offer, purchase, or sale of securities. Rather, solely at issue is whether or not the revenue misstatements were material and whether Defendants acted with the requisite scienter.

### 1. Materiality

■ "The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'" *Merchant Capital,* 483 F.3d at 766 (quoting *SEC v. Carriba Air,* 681 F.2d 1318, 1323 (11th Cir.1982)). In other words, a statement or omission is material where "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable shareholder as having significantly altered the 'total mix of information available.'" *DCI Telecommunications,* 122 F.Supp.2d at 498 (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Summary judgment is appropriate where the misstatement is "so obviously important to an investor that reasonable minds cannot differ on the question of materiality." *TSC Indus., Inc. v. Northway, Inc.,* 426

U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Finally, "whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 162 (2d Cir.2000).

■ The Court finds that the overstatements of revenue in this case would be so obviously important to an investor that there are no genuine issues of fact concerning the issue of materiality. First, the scope of the overstatement of revenue is staggering. GlobeTel reported $16,825,522 in "off-net" revenue from Centerline, Lonestar, and Volta in 2004 and total revenue of $28,996,213. In other words, GlobeTel's reported "off-net" revenue consisted of 58% of its total revenue reported. For the year 2005, GlobeTel reported $70,916,586 in "off-net" revenue from Centerline, Lonestar, and Volta, or 87.4% of its total reported revenue of $81,143,838. For the first quarter of 2006, GlobeTel reported $20,502,876 in "off-net" revenue from Centerline, Lonestar, and Volta, or 92% of its total reported revenue of $22,294,725. In total, GlobeTel reported approximately $108,244,984 in "off-net" revenue for this period, which accounted for 81.7% of its total reported revenue of $132,434,776. A reasonable investor would certainly attach importance to the fact that the vast majority of the revenue reported for GlobeTel was non-existent.

■ Second, GlobeTel itself obviously attached importance to its revenue figures and routinely emphasized these numbers and its success in growing its revenue base in press releases.[18] Whether a company advertises record breaking revenues or

---

**18.** Rule 801 of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The press releases are not hearsay as they are not considered for the truth of the matter asserted.

otherwise aggressively promotes its revenue numbers in its press releases may be considered a factor in determining whether a given misstatement is material. *See Ganino*, 228 F.3d at 165–66 (finding a company's own press releases "implicitly acknowledge[d] the significance" of statements made); *DCI Telecommunications*, 122 F.Supp.2d at 499 (finding statements were material where company advertised record breaking revenues and "hyped" statements in annual reports, press releases, and its website). GlobeTel issued no fewer than five press releases concerning its revenue. For example, on October 13, 2004, GlobeTel issued a press release entitled, "GlobeTel Reports Fourth Quarter Revenue Projections and Other Updates," in which it emphasized its revenue projections and "increased activities in carrier traffic." (*See* D.E. 314–33 at 28.) The press release further states that, "[b]ased on a continued revenue rate of $900,000 per week, GTEL management is confident that 2005 revenues can exceed $48,000,000." (*Id.*) The March 31, 2005, press release states "the Company was able to obtain its goal of growing its revenue base in 2004." (*See* D.E. 314–33 at 30.) That press release further quotes Huff as saying "[w]e wanted to grow our revenue base in 2004 and we did just that." (*Id.*) The press release also states GlobeTel's total revenue for the year was $28,996,213. (*Id.*) The remaining press releases contain similar statements. The fact of the matter is that GlobeTel repeatedly emphasized its revenue numbers to the public through numerous press releases during the relevant time period. Such a concerted emphasis on revenue is evidence that a reasonable investor would have attached importance to GlobeTel's revenue statements.

Third, the fact that GlobeTel subsequently issued amended annual reports for 2004 and 2005 that removed the "off-net" revenue and drastically reduced GlobeTel's reported revenue for those years further demonstrates that GlobeTel's statements were material. *See SEC v. Kelly*, 663 F.Supp.2d 276, 285 (S.D.N.Y.2009) (finding that under GAAP, "a restatement issues only when errors are material. Thus, the fact that AOL restated its revenues to correct for the improper recognition of certain advertising revenues in connection with the transactions detailed in the complaint belies any suggestion that any misstatement or omission was not material") (citing *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 437 (S.D.N.Y.2005)).

Fourth, the Court notes that revenue is generally considered an important indicator of a company's financial health. *See SEC v. Reyes*, 491 F.Supp.2d 906, 910 (N.D.Cal.2007) (noting statements focusing on revenue and cash flow "are widely, if not universally, regarded as the best indicators of a company's financial health"); *SEC v. Intelliquis Intn'l, Inc.*, 2003 WL 23356426 at *10 (D.Utah 2003) (finding overstated revenue material especially where the overstated sales made up such a large percentage of total sales). The Court can think of few indicators a reasonable investor would consider more important than whether or not a company is generating business and the extent of that business. Defendants focus on the fact that each revenue overstatement was accompanied by an offsetting fictitious expense. In essence, they assert that because the false transactions resulted in no net income to GlobeTel or even resulted in negative income, any overstatements of revenue had to be immaterial. They also encourage the Court to consider that GlobeTel was simultaneously reporting large operating losses and overall poor financial condition. Defendants believe GlobeTel's disclosed losses, which ranged up to $30 million, and consistently negative reports

regarding income, would have been far more significant to an investor. Nevertheless, the materiality inquiry is not concerned with what disclosures may be *most* important to a reasonable investor. A financial statement that reports largely negative results does not automatically render complete fabrications immaterial. Certainly, a reasonable investor would have considered the revenue overstatements more significant had there been no reported offsetting expenses. Nevertheless, there is no requirement that a misstatement improve a company's balance sheet in order to be material to an investor.

■ Finally, the Court notes that the movement of a company's stock price, or lack thereof, is not dispositive of whether a given statement is material. Rather, whether a public company's stock price moves up or down is simply a factor that may be relevant to materiality. *See United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.1991); *SEC v. Stanard*, 2009 WL 196023 at *23 (S.D.N.Y.2009); *Manavazian v. Atec Group, Inc.*, 160 F.Supp.2d 468, 483–84 (E.D.N.Y.2001); *DCI Telecommunications*, 122 F.Supp.2d at 499 ("There is no requirement that stock prices fluctuate as a result of a defendant's misstatements or omissions in order for them to be material").[19] Typically, stock price movement is evaluated more in the context of determining the issue of reliance in private securities actions. Assuming any movement in GlobeTel's stock price following any of the alleged false statements was negligible,

the Court nonetheless finds GlobeTel's overwhelmingly inflated revenue statements were materially misstated as a matter of law. Any lack of movement in GlobeTel's stock price may reflect GlobeTel's offsetting overstated costs tempered investors overall enthusiasm for the company. Nevertheless, the magnitude and scope of the overstatements, the company's repeated emphasis on its revenue in numerous press releases, and its subsequent restatement all support the conclusion that GlobeTel's overstatements were material. The fact of the matter is that more than 80% of GlobeTel's reported revenue was non-existent. The Court finds that the overstated revenue would be so obviously important to an investor that reasonable minds cannot differ on the question of materiality.

### 2. Scienter

■ Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter can be shown through a defendant's acts of knowing misconduct or through acts demonstrating recklessness. *Carriba Air*, 681 F.2d at 1324. The Eleventh Circuit has stated that, "severe recklessness satisfies the scienter requirement." *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989) (citing *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d

---

**19.** Defendants cite to *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir.2000), as support for the proposition that when a stock is traded in an efficient market, the materiality of disclosed information may be measured by its effect on the price of the firm's stock. The rule discussed in *Oran* was actually first articulated in a prior Third Circuit case, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir.1997). The Court is not aware of any Eleventh Circuit decisions approving or adopting the Third Circuit's approach. Additionally, the Court notes that the imposition of such a bright-line rule to the determination of materiality would seem to conflict with the "fact-specific" inquiry mandated by *Basic*. *See* 485 U.S. at 239–40, 108 S.Ct. 978. It would seem the best approach would be that adopted by the cases cited previously, in which the movement of a company's stock price is but one factor in evaluating materiality.

1004, 1010 (11th Cir.1985)). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (quoting *Broad v. Rockwell Intn'l Corp.*, 642 F.2d 929, 961–62 (5th Cir.1981) (en banc)).[20] A defendant's scienter can be proven through direct or circumstantial evidence. *SEC v. Ginsburg,* 362 F.3d 1292, 1298 (11th Cir.2004). Although both materiality and scienter are fact-specific issues ordinarily left to the trier of fact, summary judgment may be appropriate in certain cases. *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989); *Ross v. Bank South, N.A.,* 837 F.2d 980, 1003 (11th Cir.1988).

█ The undisputed facts demonstrate such an extreme departure from the standards of ordinary care that summary judgment is warranted as to the issue of scienter. As an initial matter, the "off-net" revenue scheme began each quarter with GlobeTel executives advising Monterosso and Vargas how much "off-net" revenue was desired. Each quarter brought demands for more revenue. This arrangement wherein Defendants were being asked to reverse-engineer ever increasing amounts of revenue in itself should have raised at least some suspicion.

It is also worth noting that the premise of the "off-net" revenue program is inherently problematic despite Defendants' attempts to complicate it. At every turn, Defendants contend they believed they could purchase other company's revenue based upon assurances Monterosso received from Jimenez and other GlobeTel executives that GlobeTel had operated similar programs in the past with authorization from its accountants. The concept, as implemented by GlobeTel, involved claiming revenue from traffic that did not run on any switches owned or leased by it or any of its subsidiaries. As the SEC notes, the concept is akin to Verizon recording revenue from telecom traffic run by AT & T on its own switches or switches and telecom equipment leased or paid for by AT & T but actually owned by third parties.

More importantly, the "off-net" revenue program revolved around creating fictitious invoices and supplying them along with unrelated CDRs to GlobeTel. Defendants admit that the "off-net" revenue scheme involved altering invoices obtained from Hay and Leblo. They admit that Vargas, at Monterosso's direction, altered invoices pertaining to business conducted between WCCS and Verizon's subsidiary Codetel. Defendants admit that Vargas would take WCCS invoices and change the names such that they reflected non-existent sales of telecom minutes from WCCS to Volta. Vargas would then create fake invoices depicting sales from Volta back to Mercury (which was the same company as WCCS). Yet, Volta never provided Mercury with these invoices nor provided payment to WCCS for these fictitious telecom services. More egregious than simply changing the names of the parties involved in the transactions is the fact that Defendants would occasionally add an additional $275,000 to $285,000, to a weekly invoice. Additionally, Hay testified that Mercury and WCCS never did any actual business with Volta and there is no dispute that

**20.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

Volta itself was never operational. Monterosso and Vargas could not have believed it was proper to report revenue that involved manufacturing invoices using other companies' letterhead but changing the names of customers or vendors and altering the amounts. The fact that Monterosso and Vargas never sent invoices from Volta, Lonestar, or Centerline, to their supposed vendors or customers underscores the fictitious nature of the entire scheme and demonstrates their knowledge.

Because no telecom services were actually provided by GlobeTel's subsidiaries but CDRs were needed to corroborate the telecom traffic reflected on the invoices, Defendants also had to obtain or create corresponding CDRs. Monterosso admits that in order to substantiate the fictitious revenue reported in the fake Volta invoices, Monterosso or Vargas (at Monterosso's direction) would then obtain CDRs purporting to document calls related to those fake invoices. (*See* Combined Complaint at ¶ 42; Amended Answer, D.E. 474 at ¶ 42.) Some of these CDRs were obtained from Leblo, who had nothing to do with WCCS, Mercury, or Volta. (*Id.*) Defendants engaged in similar conduct for each of the subsidiaries Volta, Lonestar, and Centerline. Furthermore, Defendants acknowledge submitting these falsified invoices and corresponding CDRs to GlobeTel knowing they would be entered into the company's general ledger and relied upon by the company's accountants and outside auditors.

Further evidence of Defendants' scienter is demonstrated by the scheme to generate an additional $1.6 million in revenue for the first quarter of 2005. According to Monterosso, after the first fiscal quarter for 2005 ended, Lynch spoke with Monterosso over the phone and requested an additional $1.6 million in revenue. (*See* Monterosso Depo., D.E. 365–1 at 36.)

This occurred sometime in April 2005. Monterosso testified that he then called Leblo to see whether he could provide any additional revenue for that quarter. (*Id.*; D.E. 365 at ¶ 73.) Leblo "looked into it" and called Monterosso back saying that he could provide the additional $1.6 million. (*Id.*) According to Monterosso, Leblo then provided the CDRs representing the $1.6 million of traffic from the first quarter, Vargas prepared the invoices based upon the CDRs, and the revenue was recorded. (*Id.* at 37; D.E. 365 at ¶ 73.) Nevertheless, correspondence between Vargas, Monterosso, and Leblo indicates Defendants defined how they wanted the additional CDRs to create the additional revenue. After Lynch requested Defendants provide the revenue for the prior fiscal quarter, Vargas sends an e-mail on April 27, 2005, to Leblo (with a copy to Monterosso) "per your discussion with Joe regarding the additional $1.6 million." (*See* D.E. 314–28 at 74.) That e-mail attaches a spreadsheet. (*Id.*) The spreadsheet very clearly delineates the sources and amounts of the additional $1.6 million requested. (*Id.* at 75–77.) For example, the spreadsheet distributes the $1.6 million between the three companies: Lonestar to receive an additional $1,010,500, CSI to receive an additional $109,500, and Volta to receive an additional $466,500. (*See* D.E. 314–28 at 77.) The spreadsheet also delineates the amounts of additional revenue to be attributed to various weeks of traffic during the first quarter of 2005. For example, the spreadsheet provides that Lonestar should receive $135,000 for the week of February 7–13th, $140,000 for the week of February 14–20th, $142,500 for the week of February 21–27, and so on until the end of the first quarter. (*See id.* at 75.) The April 27, 2005, e-mail and spreadsheet appear to contradict Monterosso's testimony to the extent that it appears Monterosso and Vargas dictated the form and amounts of

the CDRs they wanted in order to conform to their invoices and the additional revenue demanded from GlobeTel. To the extent that Monterosso and Vargas were dictating where the additional traffic or revenue should come from in order to make up the additional $1.6 million, this also tends to show Defendants knew the CDRs and invoices never really corresponded with any real telecom traffic, the traffic represented by the CDRs was not really run through Leblo's switch, and Defendants' knew they were engaged in a fraudulent scheme. To the extent that Defendants were also requesting CDRs for telecom traffic as it related to Volta, which supposedly only did business with Hay's companies Mercury and WCCS, the e-mail and spreadsheet tend to suggest knowledge or at least recklessness.

Several other factors also demonstrate no factual issues exist as to Defendants' scienter. Pursuant to the 2004 joint venture agreement entered into between CSI and GlobeTel, neither CSI nor Monterosso received any payment if Centerline did not generate at least $25 million in revenue. Thus, the joint venture agreement provided a huge incentive for Defendants to engage in a scheme to overstate revenue. Additionally, Defendants acknowledged their awareness that GlobeTel's failure to meet revenue goals would likely negatively impact its stock prices.

 Finally, the Court is permitted to draw adverse inferences against Vargas based upon his invocation of his Fifth Amendment privilege and refusal to answer questions at his deposition. *See United States v. Two Parcels of Real Property Located in Russell County, Alabama*, 92 F.3d 1123, 1129 (11th Cir.1996); *Arango v. United States Dept. of the Treasury*, 115 F.3d 922, 926 (11th Cir.1997). On September 28, 2010, the Court granted in part the SEC's motion *in limine* to permit adverse inferences to be drawn against Vargas. (*See* D.E. 464.) Specifically, the Court noted "[w]ith regard to Vargas, his deposition testimony as to his knowledge of the alleged schemes would have proven useful in the Commission's attempt to prove scienter." (*Id.* at 17.) Nevertheless, the Court cautioned that any adverse inferences drawn would not result in automatic summary judgment but rather would be evaluated in light of all of the other evidence. (*Id.* at 16–18.) At his deposition, Vargas invoked his Fifth Amendment privilege against self-incrimination with regard to questions about the $1.6 million revenue addition, the invoices and CDRs he created and supplied to GlobeTel, payments he made to Leblo and others in exchange for documents, and his knowledge and understanding of the "off-net" program. The adverse inferences drawn from Vargas's refusal to answer these questions additionally support summary judgment on the issue of scienter against Vargas.

### 3. Causation

The SEC alleges Defendants are liable for primary violations of the anti-fraud provisions on the theory that they caused GlobeTel's misstatements and participated in a scheme to defraud. In Count III of the Combined Complaint, the SEC also alleges Defendants are liable for secondary violations of the anti-fraud provisions pursuant to an aiding and abetting theory of liability.

 In order to be held primarily liable for a false statement, the SEC need not show that the defendant actually *made* a misrepresentation or omission—only that he or she *caused* the misstatements or omissions to be made and knew the statements were calculated to reach investors. *SEC v. May*, 648 F.Supp.2d 70, 77 (D.D.C. 2009) (citing *Wolfson*, 539 F.3d at 1261).

In order to demonstrate that a defendant caused a false statement to be made, the SEC must show he or she played "an integral role in preparing those filings that contained the misstatements and omissions at issue." *Id.* at 78 (quoting *Wolfson,* 539 F.3d at 1261).

In order to be primarily liable for Rule 10b–5(a)'s prohibition of employment of a device, scheme, or artifice to defraud, one "need only have made an intentionally deceptive contribution to an overall fraudulent scheme." *SEC v. Berry,* 580 F.Supp.2d 911, 923 (N.D.Cal.2008); *SEC v. Collins & Aikman Corp.,* 524 F.Supp.2d 477, 486 (S.D.N.Y.2007) ("a person who, in concert with others, participates in a securities fraud scheme by making false statements does incur liability under section 10(b)").

"A defendant who is not himself a primary violator, but has knowledge of a primary violation and provides substantial assistance in it, is liable as an aider and abettor." *May,* 648 F.Supp.2d at 79 (citing *Ponce v. SEC,* 345 F.3d 722, 737 (9th Cir.2003)). Nevertheless, any person guilty of aiding and abetting a violation of the securities laws may be subject to the same penalties. *See* 15 U.S.C. § 78t ("[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.").

■ The Court finds Defendants are primarily liable for violations of § 10(b), Rule 10b–5(a) promulgated thereunder, and § 17(a)(1), as there is abundant evidence that Defendants made intentionally deceptive contributions to an overall fraudulent scheme. While neither Monterosso nor Vargas actually prepared GlobeTel's financial statements or helped prepare its SEC filings, they made numerous and extensive contributions to the overall fraudulent "off-net" revenue scheme. Alternatively, Defendants would be liable under an aiding and abetting theory of liability given their substantial assistance to the scheme. Defendants role in providing fictitious invoices and CDRs in support of overstated revenue as part of the "off-net" program enabled the entire fraudulent scheme and resulted in GlobeTel materially misstating its revenue in numerous public filings.

## B. Books and Records Claims

■ Count IV of the Combined Complaint alleges Defendants aided and abetted violations of § 13(a) and Rules 12b–20, 13a–1, and 13a–13, which in part prohibit filing reports with the SEC that contain false statements of material fact, and failing to correct misleading or omitted information. Section 13(a) requires issuers to file with the SEC periodic reports that comply "with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security." 15 U.S.C. § 78m(a). Rule 12b–20 provides that "[i]n addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b–20. Rule 13a–1 requires "[e]very issuer having securities registered pursuant to section 12 of the Act (15 U.S.C. 78*l*) shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period

specified in the appropriate form." 17 C.F.R. § 240.13a–1. Rule 13a–13 deals with the requirements for filing quarterly reports with the SEC. *See* 17 C.F.R. § 240.13a–13. As discussed above, Globe-Tel filed several reports with the SEC containing materially misstated revenue. Monterosso and Vargas substantially assisted these violations by providing Globe-Tel with fake invoices and CDRs, knowing those documents would be used to record revenue.

Count V of the Combined Complaint alleges Defendants aided and abetted violations of § 13(b)(2)(A) which in part requires every issuer to make and keep records which in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer. Specifically, Section 13(b)(2)(A) requires issuers to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A). Globe-Tel violated § 13(b)(2)(A) by keeping books and records that reflected fictitious revenue from the "off-net" program, including invoices, ledger, and financial statements. Monterosso and Vargas substantially assisted GlobeTel by creating false documents and providing them to GlobeTel.

Finally, Count VI of the Combined Complaint alleges Defendants violated Rule 13b2–1 which prohibits any person from falsifying or causing to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act, and Rule 13b2–2, which in part prohibits a director or officer from making or causing to be made a materially false or misleading statement or omission to an accountant in connection with documents or reports required to be filed with the SEC. Specifically, Rule 13b2–1 provides that "no person shall directly or indirectly, falsify or cause

to be falsified, any book, record or account." *May,* 648 F.Supp.2d at 78 (citing 17 C.F.R. § 240.13b2–1; *McConville v. SEC,* 465 F.3d 780, 789 (7th Cir.2006)). "Rule 13b2–2 provides: 'No director or officer of an issuer shall, directly or indirectly: (1) make or cause to be made a materially false or misleading statement to an accountant in connection with ... (i) any audit, review or examination of the financial statements of the issuer....'" *May,* 648 F.Supp.2d at 79 (citing *McConville,* 465 F.3d at 789). Monterosso and Vargas both were responsible for creating fake invoices and CDRs and transmitting those documents to GlobeTel. These records pertained to revenue that was not generated by GlobeTel's subsidiaries. They also knew these records would be entered in GlobeTel's general ledger and would be relied upon by GlobeTel's accountants and auditors. As a result, both Monterosso and Vargas are responsible for directly or indirectly falsifying or causing to be falsified GlobeTel's books, records, or accounts. Thus, the SEC is entitled to summary judgment on its books and records claims against Defendants as well. Accordingly, consistent with this Order, it is hereby **ORDERED AND ADJUDGED** that:

1. Plaintiff Securities and Exchange Commission's Motion for Summary Judgment against Defendant Joseph J. Monterosso (D.E. 312), filed on April 26, 2010, is **GRANTED;**

2. Plaintiff Securities and Exchange Commission's Motion for Summary Judgment against Defendant Luis Vargas (D.E. 335), filed on May 3, 2010, is **GRANTED;**

3. Defendants Monterosso and Vargas's Motion for Partial Summary Judgment (D.E. 341), filed on May 3, 2010, is **DENIED;**

4. The Court finds a permanent injunction is appropriate in this case pur-

suant to 15 U.S.C. § 77t(b) as the SEC has shown a violation of the securities laws has occurred and there is a reasonable likelihood that Monterosso and Vargas, if not enjoined, will engage in further violations. *See Carriba Air*, 681 F.2d at 1322. Based upon the egregiousness of Defendants' actions in falsifying documents in support of fake revenue, the degree of scienter exhibited, Defendants' continued shifting of blame, and the increased likelihood that Defendants, who have continued to work in some fashion in the telecommunications industry, will commit future violations, the Court finds a permanent injunction is warranted. The Court also finds disgorgement and civil penalties appropriate in an amount to be determined upon referral to Magistrate Judge John O'Sullivan;

5. All other pending motions, including the SEC's Motion *in Limine* to Exclude Andrew Leone (D.E. 305), Defendants' Motion *in Limine* to Exclude Blaine Gilles (D.E. 317), Defendants' Motion *in Limine* to Exclude Stanley Murphy (D.E. 337), Defendants' Motion to Strike Declaration of Stanley Murphy (D.E. 382), the SEC's Motion *in Limine* to Exclude Evidence of Contraband (D.E. 414), the SEC's Motion *in Limine* to Preclude Monterosso from Contradicting Admissions (D.E. 416), and the SEC's Motion *in Limine* to Preclude Calling SEC Employee (D.E. 418), are **DENIED AS MOOT**;

6. This case is now **CLOSED**.